**MYCALEX CORPORATION OF AMERICA**
**v. PEMCO CORPORATION et al.**
Civil Action No. 2486.

District Court, D. Maryland.
Feb. 5, 1946.

Edgar Allan Poe, of Baltimore, Md., and Howard L. Lilienthal, of New York City, for plaintiff.

Edwin H. Brownley, of Baltimore, Md., Ivan T. Tashof, of Washington, D. C., and T. Barton Harrington, of Baltimore, Md., for defendants.

**WILLIAM C. COLEMAN, District Judge.**

This is a case of alleged unfair competition, the plaintiff claiming that after it had disclosed to the defendants its process for the manufacture of a certain product for which the defendants were supplying the plaintiff with an ingredient, the defendants, without disclosing their intention so to do, themselves wrongfully began the manufacture of the same product in competition with the plaintiff.

The plaintiff asks that the defendants be enjoined from continuing their alleged unfair competition, and be required to account to the plaintiff for the profits resulting therefrom. No question of trade-mark infringement is involved.

The plaintiff is a New York corporation engaged in the manufacture of glass-bonded mica electrical insulating material, sold under the trade-name of Mycalex. One of the defendants, Pemco Corporation, is incorporated in Maryland. Its name prior to September, 1943, was the Porcelain Enamel and Manufacturing Company of Baltimore. The other defendant, International Products Corporation, is also incorporated in Maryland but is under separate ownership. Both defendants deny that they have engaged in any unfair trade practices with respect to the plaintiff, asserting that there was no relationship of confidence or trust between them and the plaintiff in the course of their business relations with it; that their product is a result of their own conception and not the result of any process or formula acquired from the plaintiff, and that there was no duty on their part to disclose to the plaintiff any of their processes or formulas, or their contemplated or prospective business activities.

The following material facts are found: Mycalex, a combination of two well known insulators, mica and glass, is an impervious heat-resistant, inorganic material with which metal members may be combined in molding or subsequent casting, and which is machinable and possesses unusual insulation value, especially at radio frequencies. It was invented about twenty-five years ago by a British chemist, Percy B. Crossley, and was first made with commercial success by a British company, Mycalex Co. Ltd., which was the parent company of the present plaintiff, and which, until 1941 when the present plaintiff bought it out, had supplied the plaintiff with Mycalex and which also had licensed the General Electric Company and Westinghouse Electric & Manufacturing Company to make and sell Mycalex in this country. Both the product itself and the process of manufacture are embraced in numerous British and American patents, some of which have expired. Among the United States patents are the following, unexpired: Patent to Percy B. Crossley, No. 1795200, issued March 3, 1931, and patent to Albert William Henry Wedlock, No. 2032239, issued February 25, 1936. At the present time, the Westinghouse Electric & Manufacturing Company is a licensee of the plaintiff under the latter patent.

In this ceramic material, glass, in semi-fused powered form, is used as the bonding agent to hold the particles of mica together, and in this state is known in the trade as frit, of which there are a number of types or grades, depending upon the formula used. Pemco, prior to its relations with the plaintiff which are here in issue, had been an extensive manufacturer of porcelain enamel frit used in the manufacture of stoves, refrigerators, sanitary ware, washing machines, display cases, etc. In April, 1942, the plaintiff entered into negotiations with Pemco looking towards the furnishing by Pemco to the plaintiff of the latter's requirements for frit in its manufacture of Mycalex. As a result, plaintiff's production manager visited Pemco's Baltimore plant in order to become acquainted more precisely with the kind of frit that plaintiff required. After witnessing and assisting in the manufacture of frit at Pemco's Baltimore plant, quantities of Mycalex were made with it by plaintiff at its plant in Clifton, New Jersey, and orders for specific amounts of this frit were then given by plaintiff to Pemco for delivery over a period of months, continuing into the year 1943. During this period, plaintiff's plant at Clifton, New Jersey, was visited on several occasions by officials of Pemco, always upon plaintiff's invitation, in order that these officials might acquaint themselves fully with the various stages in the production of Mycalex in which Pemco's frit was being used, and thereby might be able to improve the frit it was supplying to the plaintiff, the latter having found that this frit was not fully up to its require-

ments. In the course of these visits, full access to plaintiff's plant was given to Pemco's officials.

During and prior to the period of these visits, the General Electric Company and the Westinghouse Electric & Manufacturing Company had manufactured and sold glass-bonded mica electrical insulating material, and Pemco's director of research from 1936 to 1943 had been employed by the General Electric Company from 1927 to 1934 as head of its enamel department which manufactured the glass for the General Electric Mycalex department; and in this capacity he became thoroughly acquainted with the composition and processing of both frit and the finished product, Mycalex. After coming with Pemco, this same person made visits to the General Electric Company's Mycalex plant as late as 1940.

In addition to information so acquired as to the composition and manufacture of this material, Pemco had enjoyed, both during and prior to this period, the benefit of knowledge acquired from the numerous patents previously referred to, and from trade publications and other sources. The technical knowledge required in order to manufacture this material was well known to ceramics engineers and chemists generally. Also, commercial success of glass-bonded mica insulating material depends basically upon the use of that type of frit best adapted for the particular use to which the finished insulating material is to be put, and a determination as to what is the best type of frit involves much experimentation with formulas in order to ascertain the critical temperatures, proper heating and cooling periods, the pressing to be employed, as well as other related factors.

In December, 1942, Pemco began for the first time the manufacturing of glass-bonded mica electrical insulating material, and International Products Corporation, the other defendant, was incorporated in March, 1943, but under separate ownership, for the purpose of taking over the manufacture of this material from Pemco, which it did, the frit used in such manufacture being thereafter supplied by Pemco. Both Pemco and International were largely induced to enter this new manufacturing field because of greater opportunities believed to exist as a result of Government war requirements. Neither Pemco nor International disclosed to plaintiff in advance of their doing so, that they intended to enter this field, although Pemco had informed the General Electric Company of its intention so to do, and that company had not objected.

Plaintiff continued to receive shipments of frit from Pemco pursuant to prior agreement until the latter part of 1943, which was several months after it had learned that International was making glass-bonded mica electrical insulating material in competition with it, and it was not until August 25, 1944, that the plaintiff made any real protest. On that date it wrote both defendant companies that it considered their commercial manufacture of glass-bonded mica electrical insulation material to be in violation of plaintiff's rights in that such manufacture, after plaintiff had disclosed its process to Pemco while the latter was supplying plaintiff with frit with the implied understanding that Pemco would not compete with plaintiff, as well as defendants' failure to disclose their intention to enter into such competitive manufacture, constituted unfair competition. Defendants replied to this letter denying the charges therein contained, and on February 21st, 1945, the present suit was filed.

In order to entitle the plaintiff company to relief it is necessary for it to prove two things: (1) That what it disclosed to the defendants was of a secret or confidential character whether in terms of formulas or in terms of means for using those formulas, namely, physical plant or equipment; and (2) that the defendants made use of such disclosure, without permission, in competition with the plaintiff. See Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A.,N.S., 102. The law is thus summarized in the Restatement of the Law of Torts (Sec. 757) upon which the defendants themselves purport to rely:

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

"(a) he discovered the secret by improper means, or

"(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

"(c) he learned the secret from a third person with notice of the fact that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

"(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."

█ A trade secret may consist of any formula or pattern, any machine or process of manufacturing, or of any device or compilation of information used in one's business; and which may give to the user an opportunity to obtain an advantage over competitors who do not know or use it.

It will be seen that the law gives to the owner of a trade secret protection which is in some respects greater and in some respects less, than that afforded by the patent law. That is to say, the protection is greater than that afforded by patents in that it is not limited to a fixed number of years, and does not require novelty and invention as in the case of patents; but it is less, in that actual secrecy of the thing with respect to which protection is afforded, and also impropriety in the method of procuring the secret, are prerequisites, but are not in the case of patents.

█ It will thus be seen that the question of whether any detriment has been caused the plaintiff by reason of what the defendants may have done becomes material only if plaintiff has first proved that the information obtained by the defendants from the plaintiff, the alleged improper use of which is the basis of the suit, was of a "secret" character. That is to say, a substantial element of secrecy must exist. Matters of public knowledge or of general knowledge in an industry are not secret, any more than are those matters which are completely disclosed by the goods which one markets. An exact definition of a trade secret is not possible, but the following are some of the factors that must be considered in determining whether some particular information that has been given is a trade secret: (1) The extent to which the information is known outside of the particular business; (2) the extent to which it is known by the employees and others involved in that business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the owner of the particular business and his or its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information might be properly acquired or duplicated by others. See Restatement of the Law of Torts, Comment under Sec. 757.

█ Applying the principles just stated to the facts in the present case, we find a complete lack of proof that the information the defendants obtained from the plaintiff must be characterized as a trade secret. This is strikingly indicated, apart from other evidence, by the fact that in plaintiff's catalogue advertising Mycalex, issued to the trade, there appears in bold type the heading, "How Mycalex is made," under which is the following:

"Composition: Among insulators for electrical use, mica and glass stand out above all others (with the exception of quartz) for their low power factor, low loss and high dielectric strength. Mycalex is an ingenious combination of these two well-known insulators. There are, of course, different grades of mica, but in Mycalex only the best grades are used, in pieces which are clear, transparent and free from impurities. This is mixed with ground electrical glass and fused together under tremendous pressure at very high temperature.

"In the early development of Mycalex, lead borate glass was used but, owing to difficulties in manufacture, difficulty of machining and the poisonous nature of the borate, the 'LDS' (leadless) grade of Mycalex has been developed, resulting in improved insulating properties and greater ease and accuracy in machining.

"Processing: Carefully selected India Mica is first ground to a mesh of 200 and mixed with a secret process glass, ground to the same mesh. The mixture is pressed into sheets and a cold pressure applied of up to $2\frac{1}{2}$ tons per square inch. The sheets are next heated to a temperature of approximately 700° C. and are hot pressed under $2\frac{1}{2}$ tons per square inch pressure. After this process, they are allowed to cool gradually during a 24 hour period. Thus we find that the mica has become permanently combined with the excellent insulator glass, to form a new composition which inherits the insulating advantages of both materials and eliminates the lack of homogeneous structure of large mica sheets and the brittleness of glass."

Clearly, the aforegoing would appear to refute any claim that either the composition or processing of Mycalex was considered by plaintiff to be shrouded in secrecy. The plaintiff, however, says, in effect, that the disclosure which we have just quoted is of a much more general character than the

disclosures, abuse of which plaintiff claims occurred on the part of the defendants. Plaintiff claims that it was only through the knowledge acquired by the defendants during the visits of the latter's representatives to plaintiff's plant, with respect to formulas involving gradation in temperatures, length of the heating and cooling periods, etc., that defendants were enabled to produce, with their own frit, a commercially successful glass-bonded mica electrical insulating material. However, we do not find that the plaintiff is supported in this claim by the weight of the credible evidence. In the first place, there is a flat denial on the part of the defendants which has not been successfully contradicted, that at any time did defendants' representatives who visited plaintiff's plant, apply any formula there learned to the production of any commercial glass-bonded mica electrical insulating material. The weight of the credible evidence indicates that there was no incentive for the defendants to do so, because it appears that defendants already possessed or could readily acquire, full knowledge of the necessary formulas for making a commercially successful product, by reason of the fact that its director of research had been employed for a number of years by the General Electric Company in connection with the production of the same kind of material; and also, by reason of the fact that the defendants, just as the trade in general, had for many years past had access to numerous patents, and scientific and trade publications relating to the same subject.

Plaintiff stresses the fact that defendants never commenced to manufacture glass-bonded mica electrical insulating material for commercial use until after the visits made by their representatives to plaintiff's plant, from which they would have us draw the conclusion that defendants could not have started such manufacture at an earlier date because then, for the first time, they obtained the requisite "know-how" from the plaintiff. We are satisfied that any such inference as might prima facie be drawn is completely rebutted by the intervention of the War, which created opportunities not previously existing for the defendants to extend their production into a most natural field, namely, instead of confining their production to the so-called "raw material" or frit, to extend it to the production of the finished product itself.

Faced with this evidence, in the course of the trial plaintiff appears to have shifted its ground by claiming that even though the defendants may be found to have obtained, through the General Electric Company, substantially the same information disclosed to them subsequently by the plaintiff, nevertheless, this was no justification for their commercial use of such information, in competition with plaintiff, because if a trade secret is learned from a third person with notice of the fact that it was a secret and that such third person has himself discovered it by improper means, or his disclosure of it was otherwise a breach of duty on his part, such prior violation could not justify a violation on defendants' part.

 It is true that one who learns another's trade secret from a third person without notice that it is secret and that the third person's disclosure is a breach of his duty to the other, or who learns the secret through a mistake without notice of the secrecy and the mistake, while not liable to the other for a disclosure or use of the secret prior to receipt of such notice, is, nevertheless, liable to the other for a disclosure or use of the secret after the receipt of such notice, unless prior thereto, he has in good faith paid value for the secret or has so changed his position that to subject him to liability would be inequitable. Restatement of the Law of Torts, Sec. 758. However, we find the facts in the present case give no basis for the application of this principle, because there is no ground for saying that what knowledge defendants acquired from the General Electric Company or any other company, had been discovered by such company by improper means, or had been improperly used.

It is also true there is a good deal of deposition testimony by Mr. Barringer, engineer of insulations of the General Electric Company at the time when Pemco was supplying that Company with frit, to the effect that the type of information here in issue, the disclosure of which to the defendants by the plaintiff is claimed by the latter to have been abused, was never voluntarily released by his Company to any third party and would not now be so released because of a highly technical, secret character. But such testimony, we believe, for the purpose of the present case has little probative value both because of its rather vague, general character, and because this witness

admitted that in the production of glass-bonded mica electrical insulating material, attainment of the ultimate desired result depends, in its final analysis, no matter what formula is used, upon the application of engineering or ceramic knowledge to the final process of experimentation, that is, by trial and error.

The president of Electronic Mechanics Inc. which had made glass-bonded mica insulating material for the plaintiff corporation in 1941 and 1942, testified that the General Electric Company had voluntarily afforded his own company free access to its plant during that period, as part of the free interchange of information between the two companies, and that the information which his company thus obtained was invaluable, although he did qualify his testimony in this respect by stating that such voluntarily mutual disclosures were made as part of the War effort and confined to the War period. Even if such testimony be accepted for its full face value, we cannot see that it adds any real strength to plaintiff's contention, because it is the inherent character of the information as actually divulged at the time, not what some third party may say about it before or after the event, that must control.

Plaintiff insists that what the defendants obtained improperly from it was what may be best defined in scientific or manufacturing parlance as the "know-how"—that is to say, factual knowledge not capable of precise, separate description but which, when used in an accumulated form, after being acquired as the result of trial and error, gives to the one acquiring it an ability to produce something which he otherwise would not have known how to produce with the same accuracy or precision found necessary for commercial success. However, this argument seems to us to be merely begging the question because, unless the information that has been acquired is, as we have seen, something which, by its very nature, is secret or confidential, then it matters not how important or involved may be its character, how difficult it may be to define the precise character or means of its acquisition or just how or when it may bear fruition.

There is nothing thoughout the testimony which satisfies us that we should characterize the information which the defendants obtained from sources available to them prior to their relations with the plaintiff as partaking any more of the nature of a secret than the information later obtained from the plaintiff on the same subject. True, at first blush, if taken literally, without due regard to the case as a whole and the natural bias involved, certain of the deposition testimony appears to support plaintiff's claim. But, even if we take such testimony at its full face value, there is still the initial hurdle to be overcome, namely, wherein does the *secret* lie. It is not sufficient in the law for one to say that this or that phase of research or experimentation, or this or that factor in production, is secret. It must in fact bear the *indicia of secrecy,* and were there nothing more in the case on this point than plaintiff's own public disclosure in its trade circular of the composition and processing of its product, which we have herein before quoted, we feel this would be ample refutation of plaintiff's claim.

■ Of course we take full account of the fact that in determining the question of liability for disclosure or use of another's trade secret, according to the principles of law which we have hereinbefore stated, there is no requirement to prove, in order to impose liability, that the alleged offender use such trade secret in precisely the form in which it was disclosed to him. He may be liable even though he use it with various modifications or improvements, as a result of his own efforts. Differences in detail do not preclude liability when substantially the process used by the alleged violator is derived from the other party's secret, *if it be a secret,* in one or more of the ways defined. But, always we must first find the secret character of the disclosure. Since plaintiff itself has freely disclosed to the public the details, with close approximation, as regards initial preparation of the raw material, and the pressing, heating and cooling involved in production of the finished product, there is no ground for saying that somewhat more precise information respecting the various stages of production obtained by being allowed to participate in, or to see the actual operations, makes such additional disclosure nevertheless secret.

In view of what has just been said, it is scarcely nesessary to say anything more about the patents concerning which a large amount of testimony was introduced on behalf of the plaintiff, for the purpose of stressing the point that from none of these patents was it possible for the defendants to have obtained the com-

plete information which they obtained from plaintiff and which, as plaintiff claims, they improperly used for the purpose of entering into competition with the plaintiff.

Suffice it to say without taking up the patents in detail that there is wide tolerance allowed in them with respect to the application of the prescribed formulas. For example, in the Crossley patent, No. 1795200, previously referred to, we find the statement in the specifications that: "It will be understood that although the above proportions are stated as constituting a good and practical working example, the scope of the invention is not necessarily limited to the exact proportions before stated. They may be varied in wide limits without departing from the nature and spirit of the invention." Likewise, in the Wedlock patent, No. 2032239, also previously referred to, it is stated that: "The figures of admixture given above are those best suited for the purposes set forth, but departure from such specific quantities can be made within reasonable limits without great variation of the product and such variations are within the scope of the present invention." Also, if the specifications and claims embodied in the patents do in fact give insufficient disclosures to enable one to produce the product called for by the patents, then this is tantamount to saying that the patents are invalid. Obviously, however, plaintiff denies taking any such position because under certain of the patents it has issued licenses, one of which is still in effect. It is, of course, true that the existence of valid patents for a given process or product does not in and of itself amount to an abandonment by the patentee of rights which he may otherwise have under the principles of law aimed at protection against unfair competition. However, in its last analysis, we cannot blink the fact that the weight of the credible testimony in the present suit indicates that if the plaintiff had in fact a meritorious claim against the defendants, such claim would have been prosecuted in the form of a suit for patent infringement, rather than along the lines which have been pursued.

In Detachable Bit Co. v. Timken Roller Bearing Co., 6 Cir., 133 F.2d 632, a suit similar to the present one, brought by a bit manufacturer to restrain a steel manufacturer from competing in the manufacture of bits, the Court finding that the only knowledge that the steel manufacturer acquired through association with the bit manufacturer, related to mistakes to be avoided, held that such was insufficient to sustain a claim that the steel manufacturer had acquired valuable trade secrets which it subsequently used in breach of confidence, and, therefore, the Court denied injunctive relief. In the course of its opinion, the Court said (133 F.2d at page 635): "There is * * * the added contention on the part of the appellant that in its experimentation Timken acquired valuable trade or manufacturing secrets which it subsequently used in breach of confidence in its own manufacturing processes. There is assertion but no proof of secret processes. Neither in brief nor oral argument was counsel able to indicate, even in a most general way, the trade secrets or processes that were obtained or appropriated. The subsequent experience of the Flannery Company appears to indicate that there were none. The District Judge was of the view that if Timken acquired any knowledge through its association with Detachable, such knowledge related to mistakes to be avoided rather than to valuable practices revealed or disclosed in confidence. Perhaps such knowledge has its advantages but it is doubtful that it forms a legal equitable basis for recovery."

It is unnecessary in the present case to go as far as did the Court in the case just referred to. It may well be that, under certain circumstances, knowledge acquired as to how to avoid mistakes is of a secret character. But to summarize the present case, the crux of it is that the knowledge here acquired was so generally known in the trade, and related to factors inherently so variable, that it cannot correctly be said that there could be any one formula or set of formulas which bore the characteristics of a trade secret. The very fact that the bonding material, frit, was so intimately bound up with the manufacture of the finished product, indicates that we are here dealing with a question that must be determined by broad principles, and not by some narrow rule-of-thumb standard.

For the reasons just stated, it follows that the bill of complaint must be dismissed, plaintiff to pay the costs.