**MYCALEX CORPORATION OF AMERICA v. PEMCO CORPORATION et al.**

**No. 5522.**

Circuit Court of Appeals, Fourth Circuit.

Jan. 31, 1947.

908

Howard L. Lilienthal, of New York City, and Edgar Allan Poe, of Baltimore, Md., for appellant.

Edwin H. Brownley, of Baltimore, Md. (Karl F. Steinmann, Ivan P. Tashof and T. Barton Harrington, all of Baltimore, Md., on the brief), for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Mycalex Corporation of America (hereinafter referred to as plaintiff) instituted a civil action in the United States District Court for the District of Maryland against Pemco Corporation (hereinafter called Pemco) and International Products Corporation (hereinafter called International) based on alleged unfair competition, in which plaintiff sought an accounting and an injunction. No question of infringement of either patents or trade-marks was involved. From a judgment of the District Court dismissing the complaint, plaintiff has duly appealed. The opinion of Judge Coleman in the District Court is reported in 64 F.Supp. 420.

Plaintiff, for a number of years, had manufactured and sold glass-bonded mica, under the trade-name Mycalex. This ceramic product possessed unusual insulating qualities of special value in connection with modern electrical inventions, particularly radio. Mycalex had been invented about a quarter of a century ago by a British chemist, Percy Crossley, and had been manufactured with commercial success by Mycalex Company, Limited, a British corporation, and the parent company of the present plaintiff. There were both British and American patents embracing Mycalex, the product, also the processes of its manufacture. Some of these patents had expired before the present suit was insti-

tuted. General Electric Company, Westinghouse Electric and Manufacturing Company and Electronic Mechanics, Incorporated, had, as patent licensees, all made and sold glass-bonded mica in the United States.

Pemco had for some time been supplying frit to the plaintiff. Frit, a material composed of ground glass, is used in the manufacture of Mycalex. Some of the Mycalex made by plaintiff from the frit supplied to it by Pemco showed white spots, an undesirable result. Plaintiff complained of this and suggested that officers of Pemco come to plaintiff's plant, inspect its machinery and inform themselves of the processes used by plaintiff, with the idea that Pemco's officials might suggest means by which Mycalex, made from frit supplied to plaintiff by Pemco, would not show these objectionable spots. Always at the invitation of plaintiff, officers of Pemco did visit plaintiff's plant, where plaintiff's plant and machinery were inspected and officers of plaintiff described and demonstrated the processing to which the Pemco frit was subjected in the making of Mycalex.

In December, 1942, Pemco began the manufacture of glass-bonded mica. Pemco, though, had for some time prior to this, carried on extensive experiments and research with the idea of entering the field of making glass-bonded mica and selling it on a commercial basis. In March, 1943, International was incorporated for the purpose of taking over the manufacture of glass-bonded mica from Pemco and this arrangement was duly consummated. Before embarking on the manufacture and sale of glass-bonded mica, neither Pemco nor International informed plaintiff of this intention.

Not until August 25, 1944, several months after it learned of the manufacture and sale of glass-bonded mica by Pemco and International, did any real protest emanate from plaintiff. And, after this discovery, plaintiff continued to buy frit from Pemco. On August 25, 1944, plaintiff wrote Pemco and International protesting that plaintiff had disclosed its secret processes to the officers of Pemco in confidence (for the sole purpose of improving the frit

sold to plaintiff by Pemco) and that Pemco and International, in breach of the confidence so imposed by plaintiff, had employed or were employing these secret processes in the competitive manufacture and sale of glass-bonded mica. These charges were emphatically denied by Pemco and International. The present suit was filed on February 21, 1945.

Since the complaint contained no charge of infringement of either the Mycalex trade-mark or of any unexpired patent, plaintiff based its case on the two following theories. The first theory was that Lyman Athy, before he entered the employ of Pemco as director of research, had been in the employ of General Electric Company; that while so employed, Athy had learned in confidential disclosures by General Electric Company the secret processes and the "know-how" involved in the manufacture of glass-bonded mica; and that Athy had, when later in the employ of Pemco and International, made extensive use of the knowledge thus obtained. The second theory was that Athy and other officers of Pemco and International had, while visiting the plant of Pemco for the sole purpose of devising methods of improving the frit furnished by Pemco to plaintiff, been told in confidence by plaintiff of its secret processes and methods of "know-how" and had been permitted to inspect plaintiff's plant and machinery; and that Athy and these other officers of Pemco and International had unlawfully used this knowledge so obtained in the manufacture and sale of glass-bonded mica by Pemco and International as competitors of plaintiff. See American Law Institute's Restatement of the Law of Torts, § 757.

The first theory, we think, requires no extended discussion. It was clearly proved (and Athy himself insisted) that Athy did acquire valuable and important knowledge as to the methods, formulæ and processes involved in the manufacture of glass-bonded mica while in the employ of General Electric Company and that he freely used the knowledge thus obtained when, as an employee of Pemco and International, he directed and supervised the manufacture of glass-bonded mica

by Pemco and International. But Judge Coleman expressly found that Pemco had informed General Electric Company of Pemco's intention to enter the field of commercially making and selling glass-bonded mica and that General Electric Company had interposed no objection. This finding is amply supported by the evidence of Athy, who was not shaken on cross-examination. Further, though Athy mentioned the names of the officials of General Electric Company with whom he communicated, no contradictory evidence was offered by plaintiff. An utterly insufficient answer to this testimony is the criticism of plaintiff's attorneys that Athy's testimony was not corroborated by Greer or Turk. These two witnesses, however, were produced by the defendants and were freely open to questioning by counsel for plaintiff. And, after all, the burden of proving the alleged fraudulent conduct of officers of Pemco and International is on the plaintiff. It is not without importance that, so far as the record discloses, General Electric appears to have manifested no interest in this litigation by any positive conduct. General Electric made no attempt to intervene, file a brief as amicus curiæ or take any part whatever in the trial of the instant action in the District Court or in the appeal before us.

We come, then, to the second theory of plaintiff. This clearly can be broken down into two contentions: (1) plaintiff confidentially disclosed to the officers of Pemco secret processes and secret details of "know-how" in the production of Mycalex; (2) these officers, afterwards, with Pemco and International, actually used these secret processes and details thus disclosed in the manufacture by Pemco and International of glass-bonded mica, in unlawful competition with plaintiff. Judge Coleman found against the plaintiff on both of these contentions.

The opinion below was primarily based on the finding that the knowledge acquired by the Pemco officials on their visits to the plant of plaintiff was not secret. Said Judge Coleman (64 F.Supp. at page 426): "It may well be that, under certain circumstances, knowledge acquired as to how to avoid mistakes is of a secret character.

But to summarize the present case, the crux of it is that the knowledge here acquired was so generally known in the trade, and related to factors inherently so variable, that it cannot correctly be said that there could be any one formula or set of formulas which bore the characteristics of a trade secret."

The testimony of plaintiff's witnesses, Barringer, Replogle and Monack, might seem to indicate the contrary. All three of these testified that it would be impossible for an experienced ceramic engineer to manufacture glass-bonded mica commercially from the knowledge that could be gleaned from the patents, plaintiff's publications and the literature in this field without a long and extensive period of practical experimentation. Of these three witnesses, however, only Monack was an officer of plaintiff; Barringer was an officer of General Electric Company and Replogle an officer of Electronic Mechanics, Incorporated.

Much clearer and more definite was the testimony of the witnesses introduced by Pemco and International. Pereles, though he had left the employ of plaintiff before this suit was instituted, had been for a long time President of plaintiff. He testified positively that the information disclosed by plaintiff to the officers of Pemco was in no way secret. Equally positive, to the same effect, was the evidence of Athy and Dr. Spencer Strong, both officers of Pemco. Nor can we overlook the testimony as to the knowledge acquired by Athy when he was with the General Electric Company, the long series of experiments conducted by the officers of Pemco and the evidence that Monack knew very little about glass-bonded mica when he came in the employ of plaintiff but that Monack acquired his information in this field largely from Pereles.

Again, while the testimony of Barringer and Replogle was taken by deposition, the other witnesses testified in person so that the trial judge had the opportunity of observing their demeanor on the stand. Questions of the credibility of witnesses are for the trial judge and we cannot set aside the findings of fact by the trial

judge unless these findings are clearly erroneous. Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c. And we are unable to characterize as clearly erroneous the lower court's finding that the information disclosed by plaintiff to the officers of Pemco lacked in material and important elements the attribute of secrecy.

■ On much firmer ground, we think, was the trial judge in ruling that plaintiff failed utterly to prove that Pemco and International, in the manufacture of glass-bonded mica, actually made any material use of the information acquired by the officers of Pemco on their visits to the plaintiff's plant. The evidence of Barringer, of General Electric, and Replogle, of Electronics, here is largely speculative and conjectural; for they had little actual knowledge of the details of the operations of plaintiff and even less of the activities of Pemco and International. The only definite testimony offered by plaintiff in this connection is that of Monack. And while he enumerated at some length the many variables involved in the making of Mycalex, he failed utterly to show, with any marked degree of precision, what, if anything, the officers of Pemco actually learned on their visits to plaintiff's plant. Even clearer was his failure to prove, if we concede that the Pemco officers did thus learn something of value, that this knowledge was used by, or was of any material advantage to, Pemco and International. Monack did not compare the processes, formulæ and "know-how" of plaintiff with those of defendants, nor did he definitely indicate any similarity between the two. Had any such similarity in fact existed, it would not have been difficult for plaintiff's counsel to have elicited from Pemco's witnesses the methods and processes employed by Pemco and to have shown by affirmative evidence that Pemco's methods and processes were substantially identical, in material aspects, with the methods and processes employed by plaintiff. In striking contrast was the positive and contrary evidence of the witnesses for defendants—notably Athy, Pereles, Turk, Stufft and Dr. Spencer Strong.

Evidently realizing how devastating to the plaintiff's case was the testimony of Pereles, counsel for plaintiff rather severely attacked him for his "volunteering of information", his "general attitude" and his "hostility and resentment (to plaintiff), evidently resulting from his separation from the company at a time when it was on its feet and making money". There is little, if anything, in the record disclosing the circumstances of the separation of Pereles from plaintiff or indicating any definite grounds that might cause him to be hostile to plaintiff.

The contention might be brought forward that the plaintiff could not prove specifically its secret processes, alleged to have been pirated by defendants, without disclosing important and highly confidential information to the public. An answer to this is found in the fact that such evidence can be taken in camera and sealed, as was done in A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531; American Dirigold Corp. v. Dirigold Metals Corp., 6 Cir., 104 F.2d 863–865. No attempt was ever made by plaintiff to do this and plaintiff utterly failed, we think, in its cross-examination of the witnesses of defendant to bring out anything of importance, showing in any convincing way, that the processes and "know-how" of Pemco were not worked out independently by the officers of Pemco, particularly Athy, Spencer Strong and Turk.

An attempt is made by plaintiff to make a great deal of the fact that Pemco began the commercial manufacture of glass-bonded mica a short time after the visit of its officers to the plaintiff's plant. Apart from the long arm of coincidence, there is unquestioned force in the testimony, which could not be denied, that a prime reason for Pemco's starting this manufacture of glass-bonded mica at this time was the very extensive demand for glass-bonded mica due to the war emergency.

There is considerable testimony all through the record concerning the fact that plaintiff used a leadless frit and that Pemco, and apparently General Electric and Electronics, used a leaded frit and

plaintiff finally switched over to the leaded frit. There is some difference among the witnesses as to what changes there would be in the processes and "know-how" when leadless frit was used and when leaded frit was used. Unquestionably, though, some of the processes and "know-how" are the same as to both leaded and leadless frit and on the other hand, some of the processes and "know-how" do differ.

It is relevant that when the officers of Pemco came to plaintiff's plant, they came for a perfectly definite and legitimate purpose (to improve the frit furnished by Pemco to plaintiff) and they came always by specific invitation of the officers of plaintiff. There is certainly nothing in the record to show any fraudulent purpose before these visits started on the part of the officers of Pemco to acquire information with the idea that it would be subsequently used by Pemco in the manufacture of glass-bonded mica. If, before the first visit of the officers of Pemco to the plant of plaintiff, or at any time during these visits, any such nefarious purpose was conceived by Pemco, it would seem that some evidence could have been offered to prove this.

█ Some interesting side-lights which we think strengthen the conclusions we have reached, may be briefly mentioned.

(1) When, as is the case here, an injunction and an accounting are sought, a rather clear and convincing showing is required on the part of the plaintiff. It does not seem that any such showing has been made in this case.

(2) The conduct of the officers of plaintiff, after they discovered that Pemco was going into the commercial manufacture of glass-bonded mica does not clearly indicate that they were outraged by gross breach of confidence. Taishoff, Vice-President of plaintiff, objected only mildly and then qualified his objection by a statement that he would rather have the competition of Pemco than the competition of the Electronics Corporation. This discovery appears to have been in November, 1942, yet on November 28, 1942, Taishoff wrote a very cordial letter to Greer, Vice-President of Pemco. Nothing further appears to have been heard from plaintiff until Taishoff's letter of January 29, 1943. Plaintiff continued to purchase frit from Pemco at least until some time late in 1943. In August, 1944, Taishoff wrote to Pemco, charging breach of confidence and in February, 1945, the instant suit was filed.

(3) When the officers of Pemco went to the plant of plaintiff in an endeavor to improve the frit supplied by Pemco to plaintiff, the conduct of the officers of plaintiff was hardly that of corporate officers imparting secrets which were not to be disclosed. Mr. Poe (of counsel for plaintiff) asked Mr. Monack: "Did you indicate to them (the officers of Pemco) any conditions under which it (the information) was to be given, or anything of that sort?" Mr. Monack's reply was: "We didn't bind them with any agreement of secrecy. That is not customary between manufacturers of material and a supplier of raw material. I indicated this information I was giving them was not to be broadcast. Much of it was available in the patent and much of it we discovered ourselves."

(4) The record discloses nothing suspicious in the selling out of the glass-bonded mica business by Pemco to International. Athy gave a plausible explanation of this when he stated there was very little room in Pemco's plant and that the commercial manufacture of glass-bonded mica could be carried out more effectively in a separate plant.

(5) Judge Coleman tried again and again to obtain definite replies as to exactly which of the alleged secrets of plaintiff had been learned by Pemco and used by it in manufacturing glass-bonded mica. His efforts met with little or no success.

(6) In connection with Barringer's speculative testimony as to what a visitor to a plant manufacturing glass-bonded mica might learn, it is interesting to note that Barringer admitted: "Well, now, what a man gets can only be answered by the man himself." And finally, the Pemco officers stated in no uncertain terms that they learned nothing of any practical importance as to the manufacture of glass-bonded mica on their visits to the plant of the plaintiff.

In brief summary, the plaintiff's case is largely based on suspicion rather than a proof. Such inferences, unfavorable to the defendants, which the plaintiff seeks to draw from the visits to its plant by Pemco officers and the subsequent embarking by Pemco in the field commercially manufacturing and selling glass-bonded mica, are overcome by Pemco's previous interest and experiments in this field, inspired by the war, plus the knowledge of Athy from his association and employment with the General Electric Company, plus the utter failure of plaintiff to prove that the Pemco officers acquired any important secret information from the plaintiff or that defendants actually used, in their manufacture of glass-bonded mica, any material knowledge (whether secret or not) which was acquired by the officers on their visits (at the instance of plaintiff) to plaintiff's plant.

There appears to be very little dispute as to the applicable law here. The case most clearly in point seems to be Detachable Bit Co. v. Timken Roller Bearing Co., 6 Cir., 133 F.2d 632. Judge Coleman, in his opinion, (64 F.Supp. at page 426) quoted aptly from the opinion of Circuit Judge Simons in the Detachable Bit case. In addition to Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A., N.S., 102 (cited by Judge Coleman, 64 F. Supp. at page 422), other instructive cases are: DuPont v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016; Board of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031; Howe Scale v. Wyckoff, 198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972; Sandlin v. Johnson, 8 Cir., 141 F.2d 660; Herold v. Herold China & Pottery Co., 6 Cir., 257 F. 911; Heyer v. Allen Electric Co., 6 Cir., 117 F.2d 739; Hoeltke v. Kemp Manufacturing Co., 4 Cir., 80 F.2d 912; Goldin v. Reynolds Tobacco Co., D.C., 22 F.Supp. 61; Hartman v. Park & Sons Co., C.C.Ky., 145 F. 358; Bristol v. Equitable Life Assurance Society, 132 N.Y. 264, 30 N.E. 506, 28 Am.St.Rep. 568; Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12, 16 Am.St.Rep. 740; Peerless Patterns v. Pictorial Review, 147 App.Div. 715, 132 N.Y.S. 37; McClary v. Hubbard, 97 Vt. 222, 122 A. 469. See, also, Ellis, Patent Assignments & Licenses, 14; Callman, Unfair Competition and Trade-Marks, 690; Nims, Unfair Competition, 403; Derenberg, Patents & Trade-Marks, 124; Chafee, Unfair Competition, 53 Harv.L.Rev. 1289.

The judgment of the District Court is affirmed.

Affirmed.