TELECHRON, Inc. et àl.
v.
PARISSI.

Civ. No. 3831.

United States District Court,
N. D. New York.

April 12, 1954.

See also D.C., 108 F.Supp. 897.

Whalen, McNamee, Creble & Nichols, Albany, N. Y. (Charles E. Nichols, Albany, N. Y., Charles H. Walker, Henry J. Zafian, Charles M. Allen, Fish, Richardson & Neave, New York City, of counsel), for plaintiffs.

Andros & Smith, Albany, N. Y. (Harry Smith, Daniel H. Prior, Albany, N. Y., of counsel), for defendant.

FOLEY, District Judge.

This suit for declaratory judgment seeks judicial declaration that three certain patents owned by the individual defendant, Parissi, are invalid for several reasons, particularly want of invention, and have not been infringed by the plaintiff corporations. Further declarative relief is requested to the effect that the claimed inventions allegedly covered by the subject matter of certain patents in suit were not disclosed to either plaintiff in confidence or subject to an understanding, express or implied, that compensation would be paid to the defendant. The defendant by two counterclaims meets these proffered issues head-on. In the first counterclaim he seeks affirmative judgment that his patents involved herein are valid and infringed for which he asks the usual injunction and accounting. In the second counterclaim he demands money judgment in excess of two and a half million dollars for profits and damages for the unlawful appropriation of his ideas relative to the inventions set forth in two of the patents, the original and reissue patents in suit, which ideas and invention he claims he disclosed to the plaintiffs in confidence prior to the filing and issuance of said patents.[1]

As far as I know, there is no controversy concerning separate legal responsibility on the part of the plaintiff corporations because of independent corporate status and the evidence discloses that during most of the time material to this litigation, Telechron, Inc., previously Warren Telechron Company, was substantially a wholly owned subsidiary of the General Electric Company, and on or about June 30, 1951, became merged with and is now operated as a department of the General Electric Company. Therefore, discussion herein will treat them as one. To simplify further, the reissue patent (Reissue No. 23,261), issued August 22, 1950 on an application for reissue filed March 5, 1949, was based upon an original patent No. 2,444,-748, issued July 6, 1948 on an application filed August 28, 1945. This single reissue patent seems to be the dominant one in the consideration of the issues presented. The original and reissue patents (Nos. 2,444,748 and Re. 23,261) are entitled "Clock with visible and audible alarm means," and the third patent involved here (No. 2,512,775) is entitled merely "Signaling Device," and has been referred to throughout the trial and in the briefs as the "radio" patent.

Although originally held out as one of short duration, the trial consumed eighteen actual trial days in a period from November 1951 to May 1953. Interruption to the continuity of the trial was caused by previous court commitments and appeals from substantial questions arising during the trial involving jurisdiction and right to trial by jury. See Telechron, Inc. v. Parissi, 2 Cir., 197 F.2d 757; Parissi v. Foley, 2 Cir., 203 F.2d 454. There is little doubt in my mind that the declaratory judgment suit here was launched as a well planned counterattack to the previously instituted action by Parissi in November 1950, in the Supreme Court of New York, against the General Electric Company, based mainly upon the alleged confidential disclosure. The reversal of the true

---

1. The symbol "R" refers to the record of transcript. Because of overlapping, the pages 1 to 707 bear the prefix "1". The pages numbered 1 to 1828 are referred to by the prefix "II".

Exhibit 92, upon which decision was reserved at the time of trial, being a letter dated April 25, 1940, is received in evidence.

The numbered exhibits were introduced by the plaintiffs, and the lettered by the defendant.

position of the parties in this suit necessarily resulted in the plaintiffs producing a mass of physical and documentary exhibits in order to anticipate every possible contention of the defendant, and bring into play prematurely the entire range of patent and nonpatent defense. The evidence goes back to the year 1930, tied in with a staggering amount of letter correspondence. The usual good occlusion of issues produced by a straightforward and conventional lawsuit was not present throughout the trial, nor in the briefs, and disillusionment sets in when the defendant contends in his brief, "Only those evidentiary facts occurring after April 1, 1944, properly can be considered critical with respect to unjust enrichment," and the plaintiffs counter in their reply brief, "The case presented by Parissi's brief is by no means the case which is actually before this court." Such disagreement as to the questions presented by the proof and applicable law is not conducive to easy analysis and decision.

Simply put, however, it is the contention of Parissi that the plaintiff corporations by their manufacture and sale of flashing light alarm clocks, switch clocks, clocks for the control of radios, and clock-controlled radios have infringed his patent rights and wrongfully appropriated and used certain concrete information and ideas which he disclosed to them in confidence. Several of these articles have had outstanding commercial success, and it is obvious that if any inventive contribution was made by Parissi in the legal sense, his monetary return would be substantial. Inasmuch as the defendant places the greater stress upon his claim of unjust enrichment and misappropriation of his ideas or invention pertaining to electric clock mechanisms, it seems more appropriate to discuss and decide this problem first.

The evidence discloses an unusual background on the part of the defendant, Parissi. He is a man of limited educational and scientific training. Despite such handicap, through his mechanical and electrical instinct and aptitude, he is the owner of several patents relating to a three-wire socket device and telephone systems outside of the three patents here in suit (Ex. 43). He has been the president of the Padua Hold-Up Alarm Corporation, and inasmuch as he is no stranger to the courts such background in this respect is outlined in good detail in General Time Corp. v. Padua Alarm Systems, 2 Cir., 199 F.2d 351, certiorari denied 345 U.S. 917, 73 S.Ct. 728, 97 L.Ed. 1351. His obsession from and during the early 1930's was the development and improvement of a flashing light alarm clock with the paramount and fine ideal to abate any noisy alarm and lessen the shock to the nervous system of the sleeper, and also by means of the flashing light awaken the deaf and hard of hearing. Throughout this period the amazing fact, continuously present, is his dogged persistence and persuasiveness in the promotion of his products that attracted the interest of substantial people. His letters, throughout the entire period, even to the time of his close contact with the plaintiff corporations, would be the envy of any modern advertising agency in the competition of high pressured promotion and salesmanship. More amazing is the fact that he entered the employ of the General Electric Company in September 15, 1941, as a machinist and model maker in its industrial control department, and despite this controversy has remained an employee, due for pension because of age, in September 1953, and I assume is now the recipient of such pension. Into this ordinary employment he carried his tremendous capacity to interest, persuade and particularly to write, and from such contact, in his kind and shy manner, he developed the interest of his superiors and other officials of the General Electric Company in certain of his issued patents and other devices, mainly the flashing light alarm clock. By continued effort on the part of Parissi, this interest was propelled through the General Electric Company to the

top officers of its subsidiary, the Telechron Company. In the Spring of 1944, these efforts culminated in the demonstration by Parissi to certain representatives of Telechron, on June 5, 1944, of three certain clocks (Exs. 84, CA, CB), and it is at this demonstration that Parissi claims the disclosure in concrete form of a new structure, function and result in the electric alarm clock mechanism, which demonstration and event he makes the underlying basis of his claim for misappropriation of a confidential disclosure.

Throughout the trial it was most difficult to grasp the scope of the idea and invention Parissi claimed as being violated by the plaintiffs when allegedly they accepted the same in trust and confidence. I was not too sure whether the defendant claimed invention based upon the general idea of a flashing light alarm clock, or the particular idea of two successive signals, a visual followed by an audible, but it is now apparent that both would be old in the prior art, and in fact in a previous contact with Telechron as early as 1933, it was suggested to Parissi that the light or visual signal be followed by a bell and audible signal (Ex. 75-a). However, the issue is narrowed in the brief of the defendant and the claimed idea and invention is confined to the addition by Parissi, in April or May 1944, to the War Alarm clocks provided by plaintiff Telechron, of a second or extra disk-shaped cam to provide a first signal, a cam follower, a switchette, and a manual control switch. It should be remembered throughout that these claimed additions and adaptations were made to existent Telechron electric alarm clocks. It is simply these features, described as the two-cam mechanism, which are claimed to be so different and novel in structure as to allow the previous electric clock mechanism to operate with new concept, function and result, and play a major role in the successful commercial devices of the plaintiffs; namely, the flashing light clocks, the switch clocks,

and the popular radio alarm clocks manufactured and sold by the plaintiffs.

The most graphic description of the additions claimed to have been made by Parissi to the War Alarm clocks is obtained from Exhibit 56, a blown-up color chart of Fig. 3 of the Parissi reissue patent. This chart as explained by Robertson, an exceptional managing engineer with Telechron and a most important witness in this case, indicates by good color markings the parts claimed to be added by Parissi to the already existing parts of the Telechron War Alarm movement. The parts designated "53" and "54" in this chart of Fig. 3, and described by Parissi in his testimony as a hook and wedge, or hook and wedge cam, are not claimed by Parissi to have been present at the time he demonstrated the clocks at Ashland, Massachusetts (RII:885). Concededly these parts were not added by him until 1945 but they are very important to the issues here in the serious consideration of the import of certain letter correspondence.

An excellent comparison with the Parissi claimed invention (Fig. 3) is given by Exhibit 44, a colored chart of the mechanism of the Telechron flashing light alarm clock. It is my understanding that this mechanism with minor modifications is the clock used in the plaintiffs' flashing light clocks, switch clocks, and radio alarm clocks which Parissi claims violate his confidence and his patents. It is well to explain that in the record there is a mild haze as to mechanism of the three material clocks (Exs. 84, CA, CB) as exhibited at the time of trial in relation to their mechanical condition at the time they were brought by Parissi to Ashland, Massachusetts, on June 5, 1944, to exhibit to the Telechron representatives. In any event, it is the testimony of Parissi that despite certain changes thereafter the three clocks still have the second cam and follower which are the essentials of his alleged invention (RII:1734-5). Some clarification is obtained from two

clock mechanisms (CC, CE) in evidence as illustrative of the internal mechanism of the clocks taken by Parissi to Ashland after he made his additions (RII:1686–90). I make these explanatory remarks with the sincere hope they will enable others to find their way with less difficulty than I have had.

As stated previously, Parissi confines the critical period from April to June 1944, and makes the eye of the controversy in this phase of the case the demonstration of his altered clocks on June 5, 1944 at Ashland, Massachusetts. It is his bold and disturbing contention that the plaintiff corporations, through the wilful acts of their officers, or engineers, or draftsmen, or salesmen, or all such persons together in concert, stole his ideas and invention; i. e., this two-cam concept which he allegedly incorporated in the Telechron War Alarm clocks. There are many strong factors in the evidence which will not allow my judgment to arrive at such finding and conclusion.

The evidence, particularly certain of the letter correspondence, shows no effort by the plaintiffs to set the bait for a poor inventor and to entrap a novel, unknown and useful device. To the contrary, Parissi was the aggressor and the initiator in the attempt to interest his superiors in General Electric in his flashing light alarm clock and arrange for an audience with and demonstration before the Telechron people. Excerpts from a letter written March 17, 1944 (Ex. 151), by Parissi to Kokins, President of Telechron, when he was at the height of effort to interest Telechron and not meeting with success demonstrates clearly such fact:

"I have been working on this invention since 1933 * * *. All of these features are taken care of by my special socket * * *. May I have your kind permission to ship you my sample * * * Please do not be offended at this suggestion for I had to furnish the Bell Lab a sample, in fact they had it over three months before they were satisfied that the advantages afforded by my patented socket was worth a contract."

On the same date, March 17, 1944, he wrote to Alger, an official of the General Electric Company (Ex. Q). Important excerpts are:

"Mr. Kokins negative letter is not surprising to me * * * I only wish I had the opportunity of meeting these men. I feel quite certain that I could sell them my idea without any great effort * * *"

The most obvious weakness in the Parissi contention is the fact that in the entire correspondence during this period which finally resulted in the shipment of the three Telechron clocks to Parissi and the resulting demonstration at Ashland, there was continuous reference to wiring the clocks in accordance with his three-wire and two-wire sockets and letters patent (Exs. 140, T). At the time of receipt of the three War Alarm clocks Parissi wrote Kokins (Ex. 141, dated April 11, 1944):

"I wish to acknowledge receipt of the three clocks which you sent me, and have proceeded to wire them to include the three features covered by my letters patent * * *"

I realize, of course, that it is Parissi's claim that he did not strike the two-cam idea and additions to the War Alarm clock until he had the three clocks in his hands in April 1944 and first saw the radial cam and the twelve-hour shaft. However, in the immediate correspondence after his trip to Ashland, his novel two-cam construction or idea receives no support and the tenor of the letters from and to Parissi is again addressed to the flashing light alarm feature, the use of the three-wire socket, and his letters patent (Exs. AC, AD, AE). The first intimation that I receive in Parissi's correspondence as to the two-cam structure is contained in letters (Exs. 82, 83, 85) dated in July and August 1945. Parissi argues, but not to my satisfaction, that this reference is to the so-called hook and wedge improvement. An extremely

important letter in the ascertainment of the reality of the two-cam construction in 1944 and which casts serious doubt upon this contention is Exhibit 86, Parissi's letter to Kokins, October 1, 1945:

> "I have been able to have two signals, first the flash, then your standard buzzer \* \* \*. Under the original scheme, there would be no signal. Under my improved arrangement the person is assured of the audible signal in the event of a lamp failure."

This documentary evidence creates substantial doubt as to the claimed construction of the three clocks demonstrated at Ashland on June 5, 1944. The testimony as to the actual demonstration of the clocks and the signals produced at the demonstration is weak and inconclusive on the part of Parissi. Together with this weakness there are many other serious discrepancies, inadequacies and inconsistencies in the evidence submitted by Parissi to support his claim of misappropriation of a confidential disclosure by the plaintiff corporations.

There is serious impairment to the creation of any confidential relationship because of the General Electric booklet (Ex. 131) received by Parissi from General Electric in 1940 and 1942. Such booklet in plain, precise language warns that the company cannot consider any idea or invention on the basis of a confidential relationship, and honestly advises that where an inventor relies on patent rights there is less likelihood of misunderstanding. Despite evasion in answers, I am sure that Parissi was the recipient of such booklets. Such element of confidential relationship must be satisfactorily established in these situations. E. I. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016.

It would also be most difficult from the evidence for me to find that Parissi would hit upon such invention impressive enough for him now to describe it as novel, secret and revolutionary in structure, function and result of the electric clock mechanism, and then take such clocks to a clock company and casually mention this, to him, tremendously important two-cam concept, and place a hole in the casing of one of the clocks for all to see. In weighing the evidence, Parissi is clearly shown as a man of ingenuity and caution. In his testimony he stated that he had his own private lab in the 1930's because he did not want clock manufacturers "to get in on the invention he was working on" (RI:605). He knew the importance in 1931 of filing patent applications to avoid the trouble of proving dates "as to which one was prior with the idea" (Ex. 72, letter dated August 27, 1931, from Parissi to Safford, and in Ex. 76, letter dated in 1946, he again indicates his personal knowledge of patent procedure and problems).

The novelty of the two-cam construction is questionable from a review of the evidence in behalf of Parissi. Parissi said the addition of the second cam was the "only way" to close a switch to the flashing light circuit. Knauth, who testified he worked on the second cam, said such addition was "the only practical way." Jones testified generally to the same effect on the general use of cams. I also think it important to note that in this complete record and full presentation I find nothing objective to indicate that the alarm clock industry had any problem with the public in the time interval between signals.

Therefore, Parissi does not shoulder in my judgment the serious burden imposed upon him by law, or by even a fair preponderance of the evidence prove the elements necessary to support his counterclaim of unjust enrichment through violation of confidential disclosures. Many of the elements necessary to such recovery under the law are not shown clearly and sufficiently to carry conviction. The essentials of knowledge, confidence, understanding, express or implied, of compensation, novelty, secrecy; the combination of which constitutes the fraud and breach of faith, in my judgment is not sufficiently proven.

Mycalex Corporation of America v. Pemco Corp., D.C., 64 F.Supp. 420, affirmed 4 Cir., 159 F.2d 907; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923; Mitchell Novelty Co. v. United Mfg. Co., 7 Cir., 199 F.2d 462; Franke v. Wiltschek, 2 Cir., 209 F.2d 493; E. I. DuPont de Nemours Powder Co. v. Masland, supra; Matarese v. Moore-McCormack Lines, 2 Cir., 158 F.2d 631, 170 A.L.R. 440; Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683.

From the testimony of Knauth, Franchetti and Jones, after careful valuation, I find no direct support to disclosure by Parissi of the two-cam mechanism on June 5, 1944 to representative of Telechron. Jones, a consulting engineer in the industrial control department of the General Electric Company and a prime mover in assisting Parissi in obtaining the demonstration at Ashland, testified at the trial. His letters, on which much emphasis is placed by Parissi, are considerably weakened by his testimony to the general effect that he was mainly impressed by the results of the flashing light clock, was not interested in the means of accomplishment, and had no detailed knowledge or paid much attention to the internal mechanism (RII:- 1244–45–54–60–61).

However, despite such failure in proof, I am willing to base my conclusion affirmatively against Parissi, no matter the content and construction of the clocks he demonstrated at Ashland on June 5, 1944, upon the strong and convincing evidence submitted by the plaintiff corporations as to the questioned two-cam development and construction. I am conscious of the extreme burden placed upon the plaintiffs in this respect but in my judgment the evidence is of such high caliber as to sustain the heavy burden imposed by law. Particularly the two models (Exs. 121, 40), the radio alarm clock specifications dated May 19, 1944 (Ex. 37), the drawings dated in July 1944 (Exs. 114, 117) and in January 1945 (Exs. 118–119) lend the

strongest kind of support to the contention of independent development. Such evidence has inherent integrity. The capacity of Telechron through the years in the development of intricate electrical devices is also of great weight in sustaining independent action on its part. Most important, however, is the testimony of Robertson, Cowles, Green and Miner that the development of the second cam and connecting apparatus was done routinely, with the ease of experts in this electric alarm field, and without any observation or knowledge of the Parissi clocks containing the construction he now claims. Robertson, the supervising design engineer, and a man of quiet competence and high standing in his field, by his firm and sincere testimony, impressed me with his denial that he was present at the demonstration or had ever covertly obtained information as to the second cam mechanism from the clocks the defendant allowed to remain in the Telechron plant for a five-month period.

Robertson's attitude toward the litigation was clear in his answer, "I am quite anxious to see justice done, whatever it is" (RI:544). His detailed testimony alone, as the man in charge, is sufficient distinction to the facts in Ackermans v. General Motors Corp., 4 Cir., 202 F.2d 642, which is so urgently pressed by the defendant as a pattern for this situation. Blair and Johnson logically must be accepted as sales people with no interest in the internal mechanism of the product.

To disbelieve these men, I would have to brand them as outright perjurers and arch villains in the business world. To find for the defendant, their testimony must be wholly disbelieved on this material question. See Moore v. Ford Motor Co., 2 Cir., 43 F.2d 685.

The proof of the defendant upon this issue establishes merely suspicion, and is overcome completely by the strong evidence as to independent development. Parissi must fail upon his second counterclaim.

It is now clear to me after continuous review and analysis, to the best of my ability, of the record and the exhibits, that much of the evidence relating to the claim of misappropriation of a confidential disclosure has highly important relevancy and materiality in the disposition of the issues concerning validity of the patents, and their alleged infringement. The decision of validity or invalidity is an uncomfortable and disagreeable task, because it involves a treasured grant, both in a prideful and monopolistic sense.

However, despite the feature again of weighing and analyzing evidence to some extent, there are more definite legal standards, from statute and case law, to be applied in the solution of the problem. This is no indication that the legal yardstick eases the burden, because the patent field is immersed, at least to me, in complexity.

The reissue patent (Re. 23,261) again dominates the scene, particularly because of the emphasis placed upon it by the defendant throughout his brief. Parissi's original patent (No. 2,444,748) had twenty claims. Four of such claims, 7, 16, 19, 20, remained in the reissue, claim 11 was modified and the rest cancelled. Claims 21 to 27 were added, and we now have involved twelve claims, 7, 11, 16, 19–27, and all can be read in the single reissue patent. In the so-called radio patent (No. 2,512,775) issued June 27, 1950 on an application filed October 23, 1946, only claims 10 and 11 are involved. This patent receives scant attention in the brief of the defendant. It was not discussed at all by his patent expert, and the attitude toward this patent throughout by the defendant seems half-hearted.

A reading of the twelve claims in the original and reissue patents has been a new experience for me. They seem to say almost the same thing in slightly different form, and I am sure they would be a new experience for a doctor of semantics. I am quick to say that my inexperience in the patent art must cause this uneasy discernment. However, the claims do differentiate as to the clock being an alarm clock, an electric alarm clock, a unitary electric clock, or an alarm clock combination.

Despite the maze of words, the scope of invention claimed by Parissi in the original and reissue patents relates again to the two-cam mechanism. He sets forth as typical of his inventive contribution claim 25 of the reissue patent, and relates such concept to the devices manufactured and sold by the plaintiffs (Ex. BY). The claim of invention is based upon the new concept which gave to the electric alarm clock the new function and result, obtained by this alleged novel additional structure.

Confined to this claim of invention, I believe the claims are invalid for want or lack of invention under the stringent standard imposed by established authority and the pertinent statutes. If the claim of invention related to the result of closing a circuit to flash a light, and then a visual alarm, it would be old in the patent art (Kollman, No. 1,730,276 (1929); Dohnalek, No. 1,792,-365 (1931); Sholden, No. 2,026,070 (1935); Uhrich, No. 2,292,583 (1942) ). The involvement of the original patent with Sholden was recognized in General Time Corp. v. Padua Alarm Systems, supra. The two-cam mechanism in itself, however, from the evidence here, seems to be one that would be obvious to a person skilled in the art and therefore does not meet the non-obvious requirement in 35 U.S.C. § 103 (1952 Ed.). It does not reach the judicial imposing standards of "inventive genius," patentable novelty, and more ingenuity than the work of a mechanic skilled in the art. Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683; Cuno Engineering Corp. v. Automatic Devices, Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S. Ct. 225, 27 L.Ed. 438; Foxboro Co. v. Taylor Instrument Co., 2 Cir., 157 F.2d 226, 234, certiorari denied 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684; Paramount

Industries v. Solar Products Corp., 2 Cir., 186 F.2d 999. As the defendant argues, there has been controversy over the "flash of creative genius" test in the Cuno case [314 U.S. 84, 62 S.Ct. 41] but even in one of the cases the defendant cites, Trabon Engineering Corp. v. Dirkes, 6 Cir., 136 F.2d 24, 27, it is unquestioned that still the quality of invention must be something more than mere mechanical skill, and that routine experimentation leading to a reasonably expected result is not invention.

In this respect of lack of invention, I base my judgment upon the testimony of the men trained in the mechanical and electrical field. The addition of the second cam and integrated structure has been described by Robertson as very routine; by Cowles and Green as the easiest and natural way to obtain the desired result (RI:210, 273, 322). Knauth, Parissi's witness, said, "In fact, it seemed the only practical way to do it" (RI:1902). Parissi himself said because of the construction of the clocks, "that was the only way" (RII:1043–44).

Fundamentally, however, in my judgment, the parts added by Parissi do not achieve in their combination any function or result that was not previously achieved. The end result is the closing of a switch to cause a signal under the same principle and engagement of similar parts as previously caused the audible alarm in the plaintiffs' War Alarm clock. Strong evidence of the use of multiple cams on a single shaft to control separate electrical operations by the plaintiffs, although ridiculed by the defendant, is shown in the intricate timing devices, such as the Eaton oil burner, the DeTar program device, the Hall circuit controller, the Vickery switching mechanism, and the G. E. selector switch. Although there is some intimation in General Time Corp. v. Padua Alarm Systems, supra, that this two-cam concept solved a problem of substance commercially in obtaining a short interval, it is

impossible for me to find such fact from this record. Such problem seems to be subjective now, and the record is replete with substantial contradictions of this assumed necessity for urgent improvement, either because of public demand or limited space in the electric clock itself. All these facts impel me to the conclusion that the claims of the original and reissue patents in issue are invalid and void because they lack the necessary legal requisites of patentable invention.

■ The so-called radio patent, formerly entitled "Signaling Device," No. 2,512,775, needs little discussion because it receives little by the defendant. The alleged infringement is confined to claims 10 and 11, and the only claimed infringing device is the radio-clock combination. Ironically, in this patent, the two claims involved do not prescribe the two-cam arrangement proclaimed as such an important feature in the previous original and reissue patents. The plaintiffs' radio-alarm clock combination was put on sale in mid-October 1945, and inasmuch as there was no claim referring to the buzzer arrangement in such combination by the defendant until an amendment was filed July 2, 1948, such claims are invalid by reason of such public sale more than one year prior to these claims. Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171; 53 Stat. 1212, Act Aug. 5, 1939; 35 U.S.C.A. § 102.

The plaintiffs succeed in their request for declarative judgment as to the invalidity of the specified claims of the three patents, and as a result the first counterclaim of the defendant for infringement of these patents must be dismissed. Separate findings of fact and conclusions of law shall be filed simultaneously herewith.

The exhibits submitted in behalf of their clients will be returned to the respective attorneys at chambers.