**GENERAL TIME CORP. v. PADUA ALARM SYSTEMS, Inc. et al.**

No. 217, Docket 22281.

United States Court of Appeals Second Circuit.

Argued April 8, 1952.

Decided Sept. 17, 1952.

Chase and Biggs, Circuit Judges, concurred in part and dissented in part.

Herbert P. Kenway, Kenway, Jenney, Witter and Hildreth, Boston, Mass., Turner & Turner, John H. Schneider, Troy, N. Y., Koenig & Pope, St. Louis, Mo., for defendant-appellee.

Andros & Smith, Albany, N. Y., Charles H. Andros, Harry A. Smith, Albany, N. Y., of counsel, for defendant-appellant.

Before CHASE, BIGGS, and CLARK, Circuit Judges.

PER CURIAM.

Though the court is divided in its views nonetheless there is sufficient agreement among its members to permit the disposition of the case without remand. Judge CHASE and Judge CLARK, though of different opinions as to the merits of the controversy, agree that the court has jurisdiction to decide the case on its merits and that the provisions of Rule 54(b), Fed.Rules Civ. Proc., 28 U.S.C., relating to judgment upon multiple claims are inapplicable. Judge BIGGS, while voting with Judge CLARK on the merits, is of the view that the court is without power to entertain the appeal because he thinks that a claim within the purview of Rule 54(b), asserted by Padua, remains undisposed of. The positions of the Judges appear more fully in their respective opinions.

The net result is that a majority of the court (Judge CHASE and Judge CLARK) agree that the court possesses the power to adjudicate the controversy. A majority of the court (Judge BIGGS and Judge CLARK) agree that the decision on the merits should be in favor of Parissi. Accordingly the judgment is reversed with the direction to the court below to enter judgment in favor of Parissi as indicated in Judge CLARK'S opinion.

CLARK, Circuit Judge (concurring).

The controversy here is between the two defendants, Parissi, an inventor, and Padua Alarm Systems, Inc., a corporation original-

ly formed by him, but with which he is now at odds. The subject matter is royalties, payable by plaintiff General Time Corporation for the manufacture and sale of a "Silent Alarm Clock," patented by Parissi, but claimed by Padua to be covered by and subject to the terms of a co-licensing contract between it and Parissi. Plaintiff, a Delaware corporation, being faced with the conflicting claims of these New York defendants, brought suit for a declaratory judgment in the diversity jurisdiction of the court below and obtained permission to deposit the accrued royalties with the court. After a trial, the court construed the co-licensing contract, together with the license agreements to plaintiff, as giving Padua superior rights to the royalties and ordered the moneys on deposit in the court, as well as those paid Parissi directly, to be turned over to Padua. Parissi now appeals.

The story goes back to 1920 when the company was incorporated as Padua Holdup Alarm Corporation, to exploit certain of Parissi's inventions of that date. Parissi himself was an incorporator and owner of sixty per cent of the stock, and from 1920 to 1938, as president, vice-president, and general manager, controlled its operations and management. He remained as a director with an active interest from 1938 to 1941, but his domination of the corporation was reduced. In 1941 he ceased to be an officer or employee and went to work elsewhere. He has disposed of stockholdings so that he no longer has stock control of the corporation; as this case shows, armed warfare now obtains between them.

The devices originally exploited by the company were holdup alarm systems for banks, soon extended for use in mercantile establishments. From this Parissi's interests turned towards signalling instruments generally and beginning in 1931 he worked upon systems of light signals for telephone circuits. On March 9, 1937, he obtained three patents, Nos. 2,073,585–6–7, each for a "Telephone System" and each for a light signal or "silent alarm" "in a telephone system" as all the many claims in each patent specified. On November 9, 1937, he obtained Patent 2,098,631 for "Electric Lighting Fixture," consisting of a combined switch and three-way socket for an incandescent lamp so fashioned as to permit of the use of the light for ordinary as well as flashing or signalling purposes. Parissi claims that he offered the original ideas to Padua, which would have nothing to do with them; so he developed the devices himself and secured patents on them on his own time and at his own expense. But when Parissi came to seek exploitation of the patents, Padua made claims to them. Specifically in 1939 the parties arranged a favorable license with the Western Electric Company; to assure good title to the licensee Parissi arranged to make Padua a co-licensor, the license was jointly given, and Western Electric paid an initial $5,000, which was paid by Padua to Parissi on September 23. Immediately thereafter Parissi and Padua entered into the contract of September 26, 1939, which is the basic agreement in this suit.

In this contract Parissi recites his ownership of the four patents—specifically described by number, date of issue, and subject—states that he "is duly cognizant of the possible existence of certain moral or financial obligations" to Padua because of aid and assistance in securing the patents and in subsequent "transactions or negotiations pertaining thereto," and specifies that he desires "voluntarily and without admission of legal necessity therefor, to fully and forever liquidate and discharge any and all obligations of said nature or semblance. Therefore, for the above-expressed intent and purpose, both parties hereto agreed to accept the following terms and considerations: Party of the First Part herein, agrees to grant and does hereby grant to Party of the Second Part herein, the right and privilege, jointly with Party of the First Part, to consummate any and all agreements or contracts relating to *any or all of the above recited patents or any claim or claims contained therein.*" (I have added emphasis to the part of most significance in our later discussion.)

Other terms provided that all returns from sales or licenses should be paid to Padua, but only for the length of time that it "shall maintain its present corporate existence"; upon a sale, transfer, or devolution

of its corporate franchise, all its rights were to cease and all royalties or other payments due for the devices became payable to Parissi. And Padua agreed to pay Parissi $1,000 upon the execution of every subsequent contract of license for telephone control apparatus units and further to pay him ten per cent of all royalties received, "involving the above recited patents," together with an additional ten per cent to his patent lawyer to whom he was obligated on an earlier conditional fee arrangement, as well as five per cent to its own secretary, McRedmond, for compensation and reward for experimental work and in negotiating the Western Electric contract.

Meanwhile Parissi had been working on the development of a "Silent Alarm Clock," a clock which would signal first by a flashing light and then after an interval of a few minutes by the usual bell. At least as early as 1936 he was trying to interest clock companies in it, and in the summer of 1939 McRedmond wrote a number of such companies. By July, 1939, at least one, the Ingersoll-Waterbury division of the Waterbury Clock Company, had expressed interest in the idea, and thereafter Parissi and McRedmond made a demonstration to it. But nothing then came of the project. Parissi testified that the clock was not developed to the point of success; it employed a single rotating cam to trip both signals and the resulting intervals between the light flashes and the ringing of the bell were so long as to deprive it of utility. McRedmond claimed that by carefully filing the cam this difficulty was overcome; and he produced a model, asserted to be the same as that upon which the earlier work had been done, which appeared to operate successfully on demonstrations in the courtroom below. He also said that the failure to exploit the device was due to the commitments of the clock companies to the war effort, then necessary. The sharp conflict in the testimony which thus developed need not be resolved, as I shall point out in more detail below; for it is clear that the device then under study, whatever its eventual operability, was never used commercially. And although the parties apparently were not then aware of the fact, it seems concededly

covered by an earlier patent, the Sholden patent 2,026,070, for an "Alarm Clock" issued to one C. E. Sholden, December 31, 1935, on an application of May 22, 1933.

After Parissi left Padua he developed an alarm clock with the signalling devices he desired; this he achieved by using two cams, one to start the light signal, the other to start the bell signal. While the device could be incorporated in an electric clock, that was not necessary and it was equally usable with a spring clock; it did not employ an electric circuit for its actuation. Parissi applied for a patent on it August 28, 1945, and Patent 2,444,748 was granted him July 6, 1948, upon a "Clock with Visible and Audible Alarm Means." Then the difficulties presented by the prior art, and notably the Sholden patent, were discovered and an application for a divisional reissue was made March 5, 1949. The patent was reissued August 22, 1950, as Re. 23,261 with the broader claims which might cover the single cam clock now omitted.

Meanwhile Parissi had succeeded in interesting the plaintiff in his device and on May 14, 1945, entered into a contract whereby he gave plaintiff a non-exclusive irrevocable license in the non-telephone field under the four patents of 1937. He further represented that "he has made additional developments *relating to the subject matter of said patents,* said additional developments including a Nurses' Call System and a Silent Alarm Clock." (I am again adding emphasis to matter of special significance in our later discussion.) Parissi included in his license these "additional developments" and any further improvements he might make and plaintiff agreed to pay Parissi "a royalty of Five Cents (5¢) for each clock or other device incorporating the constructions licensed in Paragraph 1 hereof manufactured and sold under this license." Plaintiff also agreed to (and did) pay Parissi $5,000, as advance royalties. It is this sum, plus substantial additions paid into court and undoubtedly to become payable in the future, which is the prize here. All of these have been paid, however, for plaintiff's use of the silent alarm clock. Plaintiff has never made any devices under

354

the four patents of 1937 and no issue arises in this case as to those patents.

A supplemental agreement between Parissi and plaintiff of July 12, 1945, made only some corrections of no present importance. But a second supplemental agreement of March 28, 1949, was entered into in order to make the first agreement "more definite"; and it specified the additional patents included, referring to three, among which was Patent 2,444,748 on the silent alarm clock. In its complaint here the plaintiff embodied the three license agreements, together with the Parissi-Padua contract of September 26, 1939, and asked a declaration as to the rights of the parties to the royalties due from it. Parissi and Padua not only answered, but made cross-claims against each other. The district court upheld Padua's cross-claim, ruling that Parissi's license agreement with plaintiff had the effect of drawing its royalty payments within the terms of the earlier Parissi-Padua contract of September 26, 1939. In my discussion I shall first deal in turn with these agreements so essential to Padua's claim and thereafter I shall turn to the collateral issues in the case.

*First.* In my view, the only proper question here is whether or not the Parissi-Padua contract of September 26, 1939, includes in fair intent such later developments as the royalties here in question relate to. And to me it is quite reasonably clear that it does not. The contract is in terms limited to the four patents specifically named and described, as is made additionally clear by the words I emphasized above, namely, "any or all of the above recited patents or any claim or claims contained therein." There could hardly be clearer language of limitation than this. The background and surrounding circumstances also support this view. A dispute having arisen as to Parissi's possible obligations, at least partially moral, he desires to settle it for all time by the adjustments and payments outlined above. Nothing at all is said as to the silent alarm clock, although the parties had been tinkering with it for more than three years. The whole transaction is instinct with the understanding that the parties were settling their differences permanently. It is now

suggested that the contract seems improvident on Parissi's part. Of course it was, if it is susceptible to the indefinite expansion now claimed by Padua and allowed by the trial court. But on its face, and with the limitations there expressed, it suggests fairness—a complete adjustment and release, with lump sum and royalty payments to Parissi and satisfaction of his counsel's contingent claim, but with the main speculative return going to Padua. So Parissi's own claim of lack of consideration cannot be upheld; obviously there was adequate consideration.

*Second.* While the point just discussed seems to me decisive of the case, I now turn to the license agreements which have been given such operative effect below. As I understand it, the interpretation I have suggested above of the 1939 contract between Parissi and Padua would be accepted by all except for the form and language of the 1945 license, particularly as supplemented by the 1949 amplification. How those later agreements with another party can serve to expand the definite earlier contract is, I submit, never made clear. Seemingly it is thought that Parissi has added his later invention to a single indivisible patent pool and that because of this willful act he can no longer separate the new contribution from the old and has lost all. This is a concept apparently somewhat analogous to that of "fungible goods," as, for instance, wheat intentionally commingled in a grain elevator where the wrongdoer is compelled to suffer because his contribution cannot be identified. The district judge has phrased it that the licensing agreement "contemplates a total consideration for a total privilege. It may not now be split either by the parties or the Court." But it is believed that such a conclusion cannot be sustained on reason or authority.

The essential difficulty found by the court appears to stem only from the fact that the license under which Padua now claims the royalties related in form to several patents —eventually to a total of seven—but constituted only a single agreement. There is no other ground for holding the payment provisions indivisible. They certainly take care of all questions conceivable as to ap-

portionment; plaintiff is to pay five cents on each clock produced under the license. See Ming v. Corbin, 142 N.Y. 334, 37 N.E. 105. There is nothing in the general law of indivisible contracts so-called (*i. e.,* contracts where the consideration applies as a unit) to govern this quite different situation of a third party's rights under an earlier agreement. See 3 Corbin on Contracts, §§ 694–697, 1951. Certainly the case specifically relied on, Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, contains no such holding. That dealt with an entirely different matter—the validity of licensing agreements covering a large number of patents under the antitrust precedents barring "tie-in" arrangements. The holding that such aggregate licensings are not *per se* a misuse of the patent grant says, at most, that a patentee may pool his patents, at least somewhat; it is far from affirming any compulsion upon him to do so, and that, too, at the behest of third parties.

Other analogies, less pressed, seem even more far-fetched. Padua can hardly hope to claim as third-party beneficiary, since (even if New York law would otherwise permit) the licenses not only show no intent or desire to benefit Padua, but are instinct with the contrary purpose. Nor can the reference to future developments in the 1945 license—in the words I have italicized above—be taken as an admission or a basis for estoppel to include this device in the earlier transfer. Passing the point whether such a fundamental relinquishment of rights could properly be discovered in an agreement so collateral to the main transfer, it is at once clear that the statement is too innocent and colorless to have the effect suggested. In this crowded field of invention, so crowded as to require the division and reissue of Parissi's patent as recounted above, a statement to one not a party to the initial transfer that he had made additional developments *relating* to the subject matter of his earlier patents seems innocuous indeed. These several additional patents were "related" to Parissi's earlier telephonic signal patents as these in turn were to Parissi's still earlier holdup alarm signals. But there is nothing in this perfectly true and obvious statement to make the patent in question a part of a transfer of the earlier specifically described patents. To anticipate here a matter discussed below, it is far from the specific relinquishment of claim such as was made by Padua in 1946 in answering a state court suit by Parissi raising this issue. Finally Padua's attempted ratification and adoption of the license, by so stating in its answer herein, seems to me quite meaningless.

Hence I find no basis in the license agreements for a substantial extension of the 1939 contract to justify the result below. These are all the issues passed upon by the trial judge and argued by the parties on this appeal. But some question has arisen within the court as to the possibility of a claim by Padua outside and beyond the contracts. To this I now turn.

*Third.* The answer to the question just raised of a further possible claim to Padua seems, to me, most clear; no such claim is justified on the facts and Padua has not made it and would be indeed surprised at its suggestion.

Irrespective of the lack of claim, the possibility that Parissi might be considered a trustee of this invention as one developed on its time and for its benefit seems not at all permissible on this record. As we have seen, the parties made a complete settlement in 1939, at a time well after considerable attention had been given to the development of a silent alarm clock. Against this background, any new and further burden on Parissi must be based on either a very clear and definite new contract or else such extensive use of Padua facilities as to lead directly to the fruition of the inventive idea. For an inventor's ideas are his own unless he disposes of them by agreement or by conduct which may justify shop rights to his employer. He is not bound to yield up his invention by the mere fact of employment—even though it may have continued, as it did not here, until invention was achieved. United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488, with annotation at 1512; Heywood-Wakefield Co. v. Small, 1 Cir., 87 F.2d 716, certiorari denied 301 U.S. 698, 57 S.Ct. 925, 81 L.Ed.

1353; American Circular Loom Co. v. Wilson, 198 Mass. 182, 84 N.E. 133; McNamara v. Powell, 256 App.Div. 554, 11 N.Y.S.2d 491; White Heat Products Co. v. Thomas, 266 Pa. 551, 109 A. 685; Dysart v. Remington Rand, Inc., D.C.Conn., 40 F.Supp 596, 601. Here, whether we take Parissi's testimony that the work was unsuccessful or McRedmond's that it eventually produced a workable clock, it is wholly clear that this was not the clock finally used nor was the idea upon which it was based eventually employed in plaintiff's products.

This Padua substantially concedes in its reliance upon the contracts. True, it does make allegations that Parissi abused his fiduciary position with it. But that these are supporting or atmospheric, rather than ultimate, allegations is made clear time and again. The uttermost reach of the assertion appears in Padua's carefully and shrewdly framed final statement in its brief to us: "While the case was properly determined by the District Judge on the basis of the two contracts, and while we feel that it is unnecessary to depart from the four corners of the contracts in order to reach the proper decision, it must be always borne in mind that Parissi was not only an officer and a director of Padua but was for many years its alter ego. Consequently, it is respectfully submitted that *Parissi is under a much heavier obligation toward Padua than is ordinarily the case of one party to a contract.*" (Emphasis supplied.) But it is still as a party to a contract that he is to be held, and for that—and that only—which the parties fairly contemplated in the making of the contract.

The record in the court below consistently bears out this view. In its cross-claim Padua made preliminary allegations of Parissi's interconnections and relationship with it and then alleged the 1939 contract and prayed first for a decree ordering Parissi to assign all *five* patents to it. As a second or alternative prayer, it asked for a decree holding the 1939 contract in full force and effect and requiring the payment to it of all royalties under the General Time licenses, and also for an injunction prohibiting Parissi from entering into any agreement with third persons respecting any of the *five* patents, specifically described by their numbers. Final prayers, in the event neither of the first two were granted, asked for the return of the $5,000 paid Parissi on September 23, 1939, and the usual "*such other and further relief that to the Court may seem proper.*" At the trial Padua's counsel took the unusual course of amending its prayers for relief to strike out all reference to the last patent, No. 2,444,748—the only one important here. This is highlighted by the court's statement: "So that the affect [*sic*] of the amendment is to eliminate those particular patents 244748 [*sic*] from the law suit?" and counsel's response: "We have asked here that they assign to us. We are relinquishing that." And in colloquies with the court at the end of the trial counsel further amplified his position that Padua was not making any claim under the new patent itself, or directly for what Parissi had invented after he left its employ; it was instead claiming under its contract. That is made abundantly clear from the extracts quoted in the margin.[1]

1. "The Court: What do you say about the proposition that this clock which is now patented by Parissi after he left and is now apparently being manufactured, or the patent at least, is being used by the General Time was a product of his mind or skill, or both, occurring after his severance from the company and not within the contemplation of the agreement?

"Mr. Kenway: To that I say first that Padua is not claiming any interest in anything he invented after he left the employ of the corporation. The second thing I say in answer to that is this: ·

From 1945 until 1948 as far as any patent on the clock was concerned it was represented solely by the original Parissi application. The first patent issued in 1948 and it wasn't until 1950 that there was an application for re-issue. The result is that in the patent as it issued in 1948 there was a claim that reads exactly on that part there. The fact that from 1945 when the General Time instrument agreement was signed until 1950 when they applied for a re-issue they were under the shield there by asserting the claim in the patent itself that read exactly on the clock there. That is what

It is this background which makes understandable other developments in the record, such as the opening statement of Padua's counsel relying on the two agreements and concluding that "We are here to collect eighty per cent that we honestly believe we are entitled to," not—be it noted—one hundred per cent or some figure other than the contract figure. So in its final brief below it relied again on the contracts and ended by stressing Parissi's "desperate attempts to avoid fulfillment of his clear obligation to live up to the terms of his agreement with Padua." And its brief to us sets forth as its only contention that the judge "was obviously correct in holding that the contracts were not severable and that the royalty payments made by General Time are total consideration for a total privilege."

The trial judge accepted and acted upon this approach. He states in his opinion: "The considerable evidence received relating to the development of the alarm clock which contains both flashing and audible signals, its status at the time Parissi ceased his employment with Padua, the efforts made to exploit and perfect the device, have not been overlooked. No findings are made based thereon, and no discussion thereof is deemed necessary for the reason that the rights and obligations of the parties are included within the terms of the

contracts, and the evidence above referred to, in the absence of fraud or invalidity, has no bearing thereon." And so he discusses the contracts and upholds the agreements, finds that Padua has ratified the license to plaintiff, and directs a decree enforcing the contracts and ordering the royalties paid over to Padua. The judgment he entered goes even further in its provision that the moneys received by Padua under it "shall be distributed by it in accordance with the terms and conditions of its agreement with said Parissi" of September 26, 1939. Thus Padua was to receive nothing over its agreed eighty per cent, while Parissi and his lawyer took the other twenty per cent. This seems to me quite conclusive as to what Padua wanted and the court gave. Its bearing on the question of appealability discussed below seems also obvious.

I add that even on Padua's own contentions, there seems some incoherence in what it claims. At one time it apparently intended no claim of any kind as to this invention. For in 1945, after plaintiff had raised question upon finding the 1939 contract on file in the patent office, Parissi started suit against Padua in a state court attempting to obtain a declaratory judgment releasing him from Padua's claim on this invention and Padua's president in 1946 verified an answer saying as "a sep-

---

he had before he left. Consequently we feel that we are certainly entitled to collect for that period.

"The reason I struck from the complaint the reference to the original patent was because it has been re-issued and in the process of the re-issue the claims have been narrowed down to what he invented after he left the employ. The original patent no longer exists. That was surrendered to the Commissioner of Patents and all there is is the re-issue and that has claims that we are very clear about. He did that after he left the employ for whatever worth it may be. But until that re-issue application came out the production afforded Parissi was describing the same clock before he left.

"The Court: Did I get the full import of your statement there? Did you say that the patent now issued, which is Exhibit 20 contains only claims which you concede were invented by Parissi after he left?

"Mr. Kenway: Yes.

"The Court: Well, then do you still claim then the right to recover royalties for the use of that patent?

"Mr. Kenway: Not for the use of that patent alone, but we still claim the right to receive royalties under the license involving the other four patents which have not expired.

"In our original pleadings we prayed that the Court assign us that clock patent. After the suit was filed then the re-issue came along and we felt we had no claim to the re-issue. That does not affect the situation. We are not trying to claim royalties on any patent. We are trying to claim royalties on two agreements, and the Supreme Court said it wouldn't have made any difference if they had never made a clock or never practiced any invention in this agreement. If they made locomotives and decided to pay royalties then I say we are entitled to collect."

arate affirmative defense," "That the Defendant does not now claim, nor has it at any time claimed, any interest in the so-called 'silent alarm clock' or invention thereof referred to in paragraphs of the complaint numbered 3, 4, 5, and 7 or in any contract the Plaintiff may have made in connection therewith." On the basis of this Parissi withdrew his suit, thereby, apart from all else, providing all the elements of estoppel against Padua from making its present claim. McRedmond on the stand tried to explain away this answer by saying he did not know just what Parissi was claiming, a dubious contention in the light of the language used and surely unavailing in the absence of some fraud. For the suit itself called upon Padua for a very definite answer and it was Padua's business to know what and how it was answering.

Again Padua shows some doubt how long its claim is to continue. In the colloquy quoted in footnote one above, Padua's counsel refers to the period from 1945 to 1950 when Parissi's first patent with its more extensive claims was in existence with a claim that "read exactly" on the clock claimed to have been made by Parissi before Parissi left in 1941. Then he adds, "Consequently we feel that we are certainly entitled to collect for that period." Not only the implication of this statement, but the logic of his argument would clearly suggest that in no event should there be any payment to Padua after 1950, after which time no claim affecting Padua was being utilized in the Parissi device. But even for the period in question the contention appears unacceptable. General Time did not use or pay, nor did Parissi accept royalties, for a device made according to the broader and admittedly invalid parts of the original patent grant. Since no one was defrauded or injured, no reason appears why the part accepted by the parties should not have its normal effect from the time of the original license or why Padua, a stranger, should profit by the harmless assertion of illegal claim.

This question of termination of Padua's alleged royalty claims has also troubled my brother CHASE, who suggests as a date of termination of any payments to Padua, November 9, 1954, that being the date of expiration of the last of the four original patents to Parissi. I can see no reason, except perhaps some general equity, for such a terminating date. Either the royalties go to Padua or they do not; Padua's right can hardly be propped up on the basis of some other, not presently, applicable patents. I realize the oddity of requiring payments to Padua after all the patents in which it has any formal interest have expired. But that suggests, I submit, a re-examination of the interpretation requiring so odd a conclusion, rather than a result shaped by the equities of only the chancellor's foot.

*Fourth.* A final question as to the appealability of the judgment has been raised only within the court; the parties will be as surprised as litigants often are to find arising questions of jurisdiction which they had never imagined. But to me the answer to this issue is also most clear. On the analysis above, the trial judge decided the only question before him for decision. Consequently the judgment was most definitely final. No occasion for the judge's further action to render it final under Fed. Rule Civ.Proc. 54(b) was presented, since that applies only to an order "which adjudicates less than all the claims."

In order that my position be not misunderstood I add that I think the same result would follow had Padua asserted and pressed an alternative claim to hold Parissi as trustee for it of this patent, and had the judge made this same decision. For it would be wholly clear that, by this very act, the judge was rejecting the alternative claim in favor of the one based upon the contract. (Indeed, he could not grant them both at once; this the eighty per cent feature of the contract prevented.) Certainly a judgment is not prevented from being final if the judge does not in words elaborate on every theory presented by counsel. When a judge thinks he has finally adjudicated a case, and renders a complete judgment, that is final. He may have committed error in the theory he rejected as well as in the theory he accepted; but that should be corrected on appeal—

that indeed is the purpose of appeal. The very error should not render the judgment unappealable. The final judgment rule, traditional in federal practice, has many merits in preventing appeals on form and procedure and in limiting review to the merits. It should not be pressed to the point where it itself becomes an instrument of technicality, preventing review of matters which the parties and the judge thought—with entire propriety—had been authoritatively disposed of.

I conclude, therefore, that Parissi, and not Padua, is entitled to the royalties in issue, payable with respect to the clock patented in Patent No. 2,444,748, that payments with respect to this device are not covered by the Parissi-Padua contract of September 26, 1939, and that the judgment of the district court should so declare. The judgment is therefore reversed and the action is remanded for a judgment in accordance with this opinion.

CHASE, Circuit Judge (dissenting in part).

I agree with Judge CLARK that we have jurisdiction to decide this appeal on the merits but, instead of reversing the judgment, I would modify it in one respect and then affirm it as modified.

The General Time Corporation, a Delaware corporation, brought this action for a declaratory judgment against Padua Alarm Systems, Inc., a New York corporation hereinafter called Padua, and one Parissi, a resident of New York, to determine which of the defendants was entitled to royalty payments which the plaintiff was obligated to pay as licensee under a patent license agreement entered into between General Time and Parissi. After a trial without a jury, the court held that Padua was entitled to the royalties and entered judgment to that effect. Defendant Parissi has appealed. Decision here turns upon the proper interpretation to be given to two contracts, the license agreement mentioned above and an agreement between Padua and Parissi for the disposition of royalty payments on certain patents.

The facts are that Parissi was granted four patents in 1937, as follows: On March 9th, Nos. 2073585, 2073586 and 2073587, each for a "Telephone System," and on November 9th, No. 2098631 for an "Electric Lighting Fixture."

At the time he made the inventions on which these patents issued, Parissi was employed by Padua, which he had helped organize in 1920, owned a majority of its stock and was dominant in its management. Western Electric Co., Inc. became interested in obtaining the right to use these patents in the telephone field and, in the words of the district court, "it is plainly apparent that it became expedient to obtain the consent of both Parissi and Padua to the execution of a license agreement with Western." Consequently, on September 12, 1939, Parissi made an agreement with Padua giving to Padua the right to license Western Electric Co., Inc., jointly with Parissi and this license was executed about a week later. On September 26, 1939, Parissi and Padua entered into another agreement, the recited consideration for which being "the possible existence of certain moral or financial obligations accrued to (Padua), because of any aid or assistance of any nature whatsoever rendered to (Parissi) in pursuit of his achievement in acquiring * * * the above recited patents or in any and all subsequent transactions or negotiations pertaining thereto * * *" In this agreement, Parissi "agrees to grant and does hereby grant to (Padua) the right and privilege, jointly with (Parissi), to consummate any and all agreements or contracts relating to any or all of the above recited patents or any claim or claims contained therein." The only "recited patents" were the four patents hereinabove set forth. The contract further provided "that any and all monies or other valuable considerations accruing from sales, leases, licenses, contracts, etc. as above referred to shall be paid in full to (Padua)" and that Padua would pay "ten per cent (10%) of all monies or other valuable considerations received for royalties, sales or other transactions involving the above recited patents or any of them" to Parissi. Padua also agreed to pay to Parissi "the sum of One Thousand Dollars ($1000) upon the execu-

tion and delivery of each and every contract dated subsequent hereto, which shall license others to manufacture, use, lease or sell telephone control apparatus units." This agreement was recorded in the U. S. Patent Office on May 11, 1945.

On May 14, 1945 Parissi executed the General Time Instruments Corporation license above mentioned in which he represented that he was the owner of these same four· patents and further represented that he had "made additional developments relating to the subject matter of said patents, said developments including a Nurses' Call System and a Silent Alarm Clock." By this license, General Time Instruments Corporation was granted "a non-exclusive, irrevocable license under said patents and said additional developments and under any improvements thereon or relating to the subject matter thereof, whether patented or unpatented, which Parissi may hereafter make or develop, and/or to which Parissi has or may hereafter acquire title, * * *".

On March 28, 1949, these same parties executed another agreement which referred to that of May 14, 1945 and provided as follows:

"1. The following United States Letters Patent and Application for United States Letters Patent are included in the patents, applications, and inventions set forth. in the above identified agreement:

| Patent No. | Issued | Title |
|---|---|---|
| 2,444,748 | 7–6–48 | Clock with Visible and Audible Alarm Means. |
| 2,458,724 | 1–11–49 | Incandescent Lamp Socket |

| Application No. | Filed | Title |
|---|---|---|
| 705,068 | 10–23–46 | Signalling Device |

"2. The present agreement shall in no way modify any of the terms of the agreement of May 14, 1945, nor shall it exclude any past, present, or future invention which is included in the agreement of May 14, 1945. The sole purpose of the present agreement is to make definite the inclusion of the above listed patents and application in the agreement of May 14, 1945."

From this it is plain that the parties intended to, and did, make it certain that Patent No. 2,444,748, for the clock, was a patent on subject matter included in the license granted General Time Instruments Corporation on May 14, 1945. This was granted in consideration of the payment of $5000 to Parissi, upon the execution of the agreement, as an advance royalty payment to be credited against future royalties which were to be payable at the rate of five cents "for each clock or other device incorporating the constructions licensed * * * manufactured and sold under this license."

The licensee made the payment of $5000 to Parissi and has since manufactured and sold clocks covered by Patent No. 2,444,748 on which additional royalties have accrued and been paid into court, in accordance with an order made on stipulation of the parties, where they are held subject to disposition in accordance with the final judgment in this action. It has not manufactured or sold, as yet, any of the devices covered by the other patents grouped in the license.

It was held that the royalties were payable to Padua since it was entitled to receive, under its agreement with Parissi any royalties payable under a license covering the telephone and electric socket patents. Even though the license included other patented devices in which Padua had no interest, the royalties payable by General Time were not apportioned between the separate patents but were payable for immunity from claims for the infringement of any and all of them.

Although Parissi granted this license unilaterally, Padua has exercised its privilege to act as co-licensor of the. four patents in which it had an interest by ratifying the license and, consequently, it is now to be given effect as though it had originally been granted by both. There was no provision for the computation of royalties which would be payable solely for the manufacture and sale of any particular patented device but royalties were to be computed and were

payable for the entire license protection, at five cents per unit, for the manufacture and sale of every device which, but for the license, would have infringed any of the patents. In the absence of any such provision for the allocation of the royalties the failure of the licensee for the time being to make and sell anything covered by more than one patent does not alter the fact that the royalties paid were not only for the protection needed presently but for the assurance of the protection as to the other patents whenever the licensee might need it. It agreed to pay the price it did to obtain freedom · to do business for the life of the license without infringing any of the patents covered by it and, whether it would have paid that price for anything less is but a matter of conjecture. The privilege covered the group of patents as a whole and to measure the price for that entire privilege at a flat rate in cents per unit of a product as to which any part of the privilege was exercised was permissible. Cf. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. Their intent in this respect is apparent from the language of the license and that intent controls to prevent any judicial division or allocation of royalties to a particular patent or patents on the basis of whether one patent or more covered devices on which royalties are payable. Cf. Cosden Oil Co. v. Scarborough, 5 Cir., 55 F.2d 634; Traiman v. Rappaport, 3 Cir., 41 F.2d 336, 71 A.L.R. 475.

Any seeming harshness resulting from this construction of the license agreement follows not from anything inherent in such a construction, or in the license itself, but because of the prior contract between Padua and Parissi. On the facts of this record that seems to have been an improvident one on the part of Parissi though, if all the circumstances appeared, they might show that it was not. However that may be, it did not require Parissi to tie into a license of those patents in which Padua had an interest, other patents in which it had none. He did, however, tie them in as part of the inducement to General Time to take the license. Having secured whatever advantage that may have given him in his negotiations with General Time leading up to the execution of the license, he should bear the burden of whatever disadvantage flows from his contract with Padua.

In one respect, however, the judgment is too broad. It provides that all payments under the General Time license subsequent to those made into court shall be made to Padua. The latest of the four patents covered by its agreement with Parissi will expire on November 9, 1954. After that date, the license agreement will apply only to patents covering the so-called additional developments and in which Padua has no interest. Consequently, the failure to provide for the allocation of royalties between the two groups of patents will then no longer be controlling and the judgment should, accordingly, be modified to make royalties accruing after November 9, 1954 payable to Parissi.

As so modified, I would affirm the judgment.

BIGGS, Circuit Judge (concurring in part and dissenting in part).

Parissi, for a number of years the president, general manager, policy-maker, and controlling stockholder of Padua, during the course of his employment by Padua made certain inventions and by a contract, entered into before he had severed his connections with the company, gave Padua the status of a co-licensor with him under patents covering these inventions. After Parissi severed his connection with Padua he entered into a series of contracts with General Time for the manufacture of an "Electric Clock with Visible and Audible Alarm Means." General Time proceeded to manufacture and sell the kind of clocks referred to and, a dispute having arisen between Parissi and Padua as to who is entitled to royalties from General Time, General Time brought a declaratory judgment action in the court below pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, paying the amount of royalties due from it into court.

Parissi answered General Time's complaint as did Padua, Parissi asserting (1)

that he is the true owner of the patents and of the device covered thereby and therefore is entitled to all the royalties, and (2) that under the instant circumstances Padua is not entitled to any benefit from the licenses granted to him by General Time. Padua then filed an answer and a cross-claim in which it asserted that all royalties must be paid by General Time to it under the contracts referred to, it in turn paying Parissi 10% thereof, and, in the alternative, that Parissi is but a mere trustee for Padua for the patents and the device and that therefore Parissi is entitled to nothing. The matters referred to in this and the preceding paragraph are discussed at some length hereinafter.

The court below held that Padua was entitled to the royalties less 10% to be paid by it to Parissi. Parissi has appealed. This court is divided in opinion as appears.

It is more convenient I believe to deal first with Padua and Parissi's status under the contracts since this is the subject matter dealt with in the respective opinions of my brothers CHASE and CLARK.

By the contract of September 6, 1939 (Exhibit "D") Parissi gave Padua, as we have stated, the status of a co-licensor for the four patents named in the footnote.[1] Parissi agreed that all license fees accruing under these patents should be paid to Padua, Padua in turn to pay 10% thereof to Parissi. By the contract of May 14, 1945 (Exhibit "A") Parissi gave General Time a non-exclusive irrevocable license in the non-telephone field under the four patents designated in note 1 in return for specified royalties. The contract, however, contained clauses whereby Parissi represented that he had made additional developments relating to the subject matter of the patents, including a "Silent Alarm Clock." Then comes the phrase which supplies the sole bone of contention in the view of the court below and of my Brethren of this court. Exhibit "A" provided that General Time should pay "* * * to Parissi during the terms of * * * [the] agreement a royalty of Five Cents * * * for each * * *" clock or other device incorporating the constructions licensed in paragraph 1. Paragraph "1" designates the four patents named in note 1, supra.

The contract of July 12, 1945 (Exhibit "B") is not pertinent to the instant controversy. The contract of March 28, 1949 (Exhibit "C") specifically incorporated Patent No. 2,444,748 for a "Clock with Visible and Audible Alarm Means," Patent No. 258,724, for an "Incandescent Lamp Socket," and an Application No. 705,068, for a "Signalling Device," within the purview of Exhibit "A," the contract of May 14, 1945, and made the latter patents subject to its royalty provisions. A Reissue Patent No. 23,261, granted August 22, 1950, to which reference was made during the course of the trial, was a divisional reissue of No. 2,444,748, issued July 6, 1948, on Application S. N. 613,070, filed August 28, 1945. The reissue patent also was for a "Clock with Visible and Audible Alarm Means." There seems to be no doubt that General Time is manufacturing an alarm clock with a visible and audible means of alarm which is within the purview of Reissue Patent No. 23,261 of Patent No. 2,-444,748 and within the purview and coverage of Exhibit "A."

But at the trial Padua moved to strike out of paragraphs one and two of the prayers of its cross-complaint all reference to Patent No. 2,444,748. The reason stated for the amendment was that Reissue Patent No. 23,261 had been granted and Patent No. 2,444,748 had been surrendered to the Patent Office. Padua did not move to amend the complaint to assert any rights under Reissue Patent No. 23,261, taking the position that the claims of the reissue patent represented discoveries made by Parissi after he left Padua's employment. The amendment striking the refer-

1. As follows: No. 2,073,585, March 9, 1937, for a "Telephone System," No. 2,-073,586, of the same date, for the same subject matter, No. 2,073,587, of the same date, also for a "Telephone System," and

No. 2,098,631, November 9, 1937, for "Electric Lighting Fixtures."

The 1939 agreement was entered into because Western Electric Company, a licensee, desired to settle all questions relating to title to the patents.

ences to Patent No. 2,444,748 was granted by the court below.

At the trial in the court below Padua advanced two theories based on two separate and distinct claims. Under the first of these Padua asserted that by virtue of its standing under the contracts, it was entitled to recover the royalties paid into court by General Time and in turn was required to pay 10% thereof to Parissi. By the second or alternate claim, Padua asserted it was entitled to have conferred upon it the status of beneficial owner of the four patents designated in note 1, supra, and therefore entitled to all royalties without deduction. As to the first claim, it is clear that it was and is hotly pressed by Padua. Padua did not abandon the second claim, but nonetheless pursued it vaguely and indecisively in the court below and does not assert it in this court. This matter is discussed at greater length hereinafter.

Padua first contended that it was entitled to royalties paid by General Time because General Time is required to pay royalties "for each clock or other device incorporating * * *" the visual and audible signal device as required by Exhibit "A" whether the original four patents covered by Exhibit "D" are or are not employed by General Time. In other words, Padua contends that Parissi by his own voluntary act included within the coverage of Exhibit "A" the four patents named in note 1 to this opinion and the developments thereof in the non-telephone field and the patents designated in Exhibits "A" and "C," save, of course, Patent No. 2,444,748; that therefore, since Parissi saw fit to include the patents in a kind of patent pool which originally embraced only the other four patents, Padua is entitled to the royalties paid by General Time. The court below concluded[2] (as does Judge Chase of this court) that this view was correct and that for this reason Padua is entitled to share in the royalties in accordance with Exhibit "D." The court concluded that Padua was entitled to 100% of the royal-

ties, of which 10% was to be paid to Parissi, as specified by Exhibit "D."

As to the respective statuses of Padua and Parissi under the contracts hereinbefore referred to, I am of the opinion, expressed by my brother CLARK, that to give Padua the benefits of the royalties from General Time because General Time is manufacturing and selling alarm clocks under Patents Nos. 2,444,748, and 23,261, is to confer a windfall upon Padua. Despite the fact that in Exhibit "A" Parissi recites that disclosures in the non-telephone field covered by the four patents designated in note 1 were to be licensed to General Time and paragraphs 1 and 2 of Exhibit "A" provide that royalties are to be paid by General Time at a single stated figure if any of the patents or developments designated thereunder be employed by General Time and Exhibit "C" specifies particular patents on which the developments were based, Padua can profit from the license agreements embodied in Exhibits "A" and "C" only on some third-party beneficiary theory not recognized by the law of New York or, insofar as I am aware, by that of any other State.[3]

Exhibit "D" simply makes Padua a co-licensor of the four patents named therein. That contract contains no reference whatsoever to any future developments made by Parissi in the fields covered by the four patents and Padua is given no rights thereunder. True, Parissi by Exhibits "A" and "C" included the two additional patents, Nos. 2,444,748 and 23,261, covering later developments, in the pool, and thereby compelled General Time to pay the royalties prescribed if any of the patents in the pool were used by General Time. But in this case we are not concerned with the issue as to whether or not General Time must pay royalties but with the question as to whom, Parissi or Padua, must General Time pay the royalties. General Time must pay royalties if any of the six patents under which it is licensed are used by it. So much is conceded by all the parties.

2. No opinion reported for publication.

3. No problem in conflicts of laws is presented despite the fact that the record before this court gives no information as to where the contracts were entered into and but little indication as to where they were to be performed.

But the fact that Parissi licensed General Time and recited in Exhibit "A" that any developments made under the first four patents were also to be and were licensed to General Time cannot make Padua a beneficiary of the license agreement.

There was no valid consideration moving from Parissi to Padua under the contracts embodied in Exhibits "A" or "C." Padua was not a party to or beneficiary under these contracts, had no legally cognizable interest therein, and was not intended to have such. The fact that Padua ratified these agreements by statements made in its pleading is unavailing and indeed irrelevant. One does not acquire contract rights by ratifying an agreement to which one is not a party and under which one is not to receive a benefit. It is not even suggested by Padua, nor sensibly could it be, that Padua can presently profit by some new and hitherto unheard of theory of third-party beneficiaries. As Judge CLARK has pointed out there is a complete hiatus in both logical and legal connection between Padua and the contracts between General Time and Parissi as embodied in Exhibits "A" and "C." I agree with the conclusions he has expressed with regard to the statuses of the parties under the contracts.

My difficulty in disposing of the instant case in favor of Parissi on the merits on the present record stems from the assertion by Padua of the trust theory, the second claim hereinbefore referred to, whereby Padua seeks to have conferred upon it the status of beneficial owner of the four patents designated in note 1, supra, claiming in effect that Parissi is a mere trustee *de son tort* for it, Padua. This claim may or may not possess merit but in my view it is beyond our jurisdiction, our power, to adjudicate the instant appeal because of it.

Rule 54(b), Fed.Rules Civ.Proc., provides that a United States District Court can adjudicate one of multiple claims only upon an express determination that such an adjudication will serve the ends of justice and upon an express direction to enter judgment on that claim. Such an order is an appealable one within the purview of 28 U.S.C. § 1291.[4]

Padua in the instant suit has asserted two claims and two causes of action which have been hereinbefore referred to. First, Padua claims that it is entitled to the status of a co-licensor with Parissi under the patents hereinbefore designated and as such co-licensor is entitled to receive all the royalties paid by General Time, Padua in turn paying Parissi 10% thereof. The second claim and cause asserted in effect that Padua is entitled to a decree declaring it to be the true owner of the patents. If Padua were to prevail under this theory it would get all the royalties from General Time and Parissi would get nothing. The contract action and contract claim were disposed of by the court below and an order entered. The cause of action and the claim based on the trust thesis have never been adjudicated by the court below. The court below expressly did not pass upon the trust claim asserted by Padua. See in particular the first and fourth paragraphs of its opinion under the heading "Discussion." The court below did not make the determination or the direction required by Rule 54(b). The order made was not, therefore, a final decision within the purview of 28 U.S.C. § 1291.

The majority opinion of the court in this regard takes the position that even if Padua has pressed two alternative claims, acceptance of one claim by the court below is necessarily a rejection of the other since, in the majority view, the claims are alter-

---

4. Rule 54(b), Fed.Rules Civ.Proc., provides as follows:

"When more than one claim for relief is presented in an action, whether as a claim, counter-claim, cross-claim, or third-party claim, the court may direct the entry of a final judgment upon one or more but less than all of the claims only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates less than all the claims shall not terminate the action as to any of the claims, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims."

nate or mutually exclusive. But the court below, if it had adjudicated the claim based upon the trust theory, could have held that Padua was entitled to all the royalties, not 90% of them. The fact that a trial court decides that a party is entitled to 90% of royalties, when a claim for 100% of royalties is made in an alternate cause of action, does not exclude the possibility of recovery on a 100% claim if the latter was not adjudicated. It is only where two mutually exclusive claims are both adjudicated that the principle of exclusiveness operates. In the instant case the trial court made express reference to the trust claim in its opinion and stated in effect that it would not determine it. The trial court seems to have been of the view that both claims and causes of action were within the purview of the contracts. This was erroneous.

The majority opinion does not say that the trial court adjudicated the issue or claim presented by the trust theory. The majority view is that Padua abandoned the trust theory and claim and that the trial court was therefore at liberty not to adjudicate it. The majority pitches its decision squarely on the issue of complete relinquishment of the trust claim, spelling out this inference from a cloudy record. The trial court seemingly reached a contrary conclusion and the trial judge was in a better position than is the appellate tribunal to determine what was the effect of the conduct of the parties at the trial. If there is to be speculation upon the issue of abandonment—an undesirable result since it imposes an unjuristic function on a judicial tribunal—that speculation would be more aptly hazarded by the trial court rather than by this appellate tribunal. That this court, to reach its present conclusion, has

to speculate as to the meaning of Padua's conduct at the trial is apparent for the conclusion that there was abandonment can be sustained in no other fashion on this record.[5] There is nothing in the argument, the colloquy between court and counsel, or in the briefs of the parties in the court below[6] which is decisive of the issue. What was said and done by counsel and the parties was ambiguous.[7] This is one of the situations which Rule 54(b) was precisely framed to meet.

The case at bar presents no finely drawn issues such as were before this court in Flegenheimer v. General Mills, 2 Cir., 191 F.2d 237, 241; Lopinsky v. Hertz Drive-Ur-Self Systems, 2 Cir., 194 F.2d 422, and Telechron, Inc., v. Parissi, 2 Cir., 197 F.2d 757, 759, or before the Court of Appeals for the Third Circuit in Bendix Aviation Corp. v. Glass, 195 F.2d 267. The question presented is a simple one. I regret that I must differ from my Brethren who have distinguished themselves in the application and creation of the Federal Rules of Civil Procedure. It is my view that we are without the power to dispose of the instant case on the merits. Though this point has not hitherto been raised the issue of jurisdiction is always open. Mitchell v. Maurer, 293 U.S. 237, 55 S.Ct. 162, 79 L.Ed. 338. It may be that on remand the court below would decide the trust theory asserted by Padua against it. Cf. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560. But the claim and cause of action asserted by Padua under the trust thesis has not been disposed of by the court below; no findings of fact or conclusions of law have been made, nor any order dispositive of the trust issue entered.

5. The issue of the trust claim has never been abandoned in the pleading.

6. For the purpose of determining the issue of abandonment we must treat the briefs of the parties in the court below as if they were part of the record.

7. See, for example, the following:
    (1) Padua's counsel's statement, transcript pp. 130–136;
    (2) Padua's reply brief, pp. 7, 17, 22 and 26;

(3) Parissi's reply brief, pp. 23–26, wherein Padua's asserted trust claim is attempted to be answered by quotations from American Circular Loom Co. v. Wilson, 198 Mass. 182, 190–205, 84 N.E. 133, originally cited by Padua in support of the trust theory; and
    (4) Parissi's request for conclusions of law, Nos. "6" and "7," Parissi's reply brief, pp. 27–28.

I therefore must respectfully dissent from the conclusions reached by both Judge CHASE and Judge CLARK. The appeal should be dismissed and the case remanded to the end that the court below may adjudicate the undetermined claim asserted by Padua.