JULIAN A. McDERMOTT AND MILDRED A. McDERMOTT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 89107.    Filed October 14, 1963.

Mildred A. McDermott and Julian A. McDermott, pro se.
*Joseph Wilkes*, for the respondent.

54

56

OPINION

The primary issue is whether the amounts received by Julian from the corporation in 1955 constituted ordinary income or capital gains. The determination of this issue depends upon whether the series of so-called agreements, modifications, and waivers, executed by Julian in his individual capacity and by Mildred for the corporation in 1943 and 1944 amounted to a transfer to the corporation of all substantial rights to the patents which Julian owned at the time or subsequently developed.

At the outset it should be pointed out that section 1235 of the Internal Revenue Code of 1954 [1] is not applicable. That section provides for capital gains treatment upon the transfer of all substantial rights to a patent, but its application is specifically denied where the transfer is between related persons. Sec. 1235(d). Under section 267(c)(2), Julian is deemed to own 100 percent of the stock of the corporation and any transfer by Julian to the corporation would clearly be between related persons as defined in section 267(b)(2). The nonapplicability of section 1235 does not of itself, however, determine that the pay-

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

ments received by Julian are ordinary income. The tax consequences are to be determined under other provisions of the law. Income Tax Regs., sec. 1.1235–1(b); *Leonard Coplan*, 28 T.C. 1189.

Another statutory provision which requires consideration is section 1239. This section denies capital gains treatment in the case of a sale or exchange between an individual and a corporation where, as here, more than 80 percent of the stock of the corporation is owned by that individual and his spouse, if the property transferred is depreciable property in the hands of the transferee and if the sale or exchange was made after May 3, 1951.

Assuming that there was a valid sale or transfer of the patents and patent applications involved herein, it is clear that the property rights in such patents and applications were intangible assets subject to depreciation in the hands of the transferee within the meaning of sections 1239(b) and 167(a). Income Tax Regs., sec. 1.167(a)(3); *Best Lock Corporation*, 31 T.C. 1217, 1234. Since, however, the documents by which it is claimed such rights were transferred to the corporation were executed in 1943 and 1944, prior to May 3, 1951, it is clear that section 1239 is not applicable to the transfer of any of the patents or patent applications involved, including patent No. 2,592,-165, which was issued in 1952, but for which application accompanied by drawings and specifications was made on January 16, 1950.

Accordingly, we turn to general provisions of law regarding sales and exchanges. To be entitled to long-term capital gains treatment petitioners must show: (1) That the property in question constituted capital assets; (2) that there has been a "sale or exchange" of such property; and (3) that it had been held for more than 6 months prior to the "sale or exchange." Sec. 117(a)(4), I.R.C. 1939; *Rose Marie Reid*, 26 T.C. 622; *Kronner v. United States*, 110 F. Supp. 730 (Ct. Cl.). Respondent concedes that whatever rights Julian had in the inventions herein concerned were capital assets. He contends, however, that there was no sale or exchange and, in the alternative, that at least some of the patents and inventions were not held for more than 6 months prior to "sale or exchange."

In determining whether a sale or exchange of a patent or invention has occurred, the Court must look not only to the documents themselves, but to the "total factual complex surrounding the transaction," to determine the real intent of the parties. *Switzer v. Commissioner*, 226 F. 2d 329 (C.A. 6, 1955), affirming a Memorandum Opinion of this Court. The transaction will be treated as a sale only if the holder of the patents intended to surrender all of his interest in the patents or inventions and such surrender did in fact occur. *Rose Marie Reid, supra.* Anything less than such a transfer is a mere license and the proceeds ordinary income. *Lynne Gregg*, 18 T.C. 291, affd. 203 F. 2d 954 (C.A. 3, 1953); *Kronner v. United States*,

*supra.* Another general principle particularly applicable here is that the Court should closely scrutinize transactions between stockholders and their closely held corporation. *Roy J. Champayne*, 26 T.C. 634; *Differential Steel Car Co.*, 16 T.C. 413; *Granberg Equipment, Inc.*, 11 T.C. 704.

Petitioners contend that the series of five documents set forth in full in our findings taken collectively constituted a sale of all substantial rights to the inventions involved. We do not agree. In our opinion the documents themselves, as well as the "total factual complex surrounding the transaction" negate such a transfer.

As was stated in *Switzer* v. *Commissioner, supra,* "Although no particular form is required for an assignment, the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent."

A mere reading of the five documents in question is sufficient to show that they are not "unambiguous" and that they *do not* show a clear and unmistakable intent to part with the patents. The original agreement of July 28, 1943, was clearly not a transfer of all substantial rights in the patents and inventions involved. It was limited to "use" of the patents by the corporation. It was revocable by Julian (par. 1), nonexclusive to the corporation (par. 9), and speaks of the possible future purchasing of such "items" by the corporation from Julian (par. 8). It also reserved to Julian the right to withhold from the corporation any item he might in the future design or invent (par. 3), and provides for the payment by the corporation of expenses of defending infringements only as to items made, sold, or reproduced by the corporation. These rights retained by Julian negate the existence of a sale. *Arthur M. Young*, 29 T.C. 850, affd. 269 F. 2d 89 (C.A. 2, 1959); *Lynne Gregg, supra.*

The modification of July 10, 1944, provided for revocation by the corporation as well as by Julian. It also purported to make all licensing exclusive to the corporation but nevertheless provided that whenever the corporation's facilities were inadequate to manufacture, distribute, or service any item, Julian, on 30 days' notice, could issue such additional licenses as he deemed necessary. Cf. *Lynne Gregg, supra* at 302.

In the waiver dated July 24, 1944, Julian waived *his* right to revoke but left undisturbed the corporation's right to revoke as provided in the modification of July 10, 1944. This might be considered a condition subsequent beyond the control of Julian, were it not for the fact that Julian and his wife owned all the stock of the corporation and consequently had control of its actions. The right of the corporation to revoke does not appear to have been disturbed by any of the subsequent documents. This, of itself, is sufficient to indicate Julian did not relinquish all control over his inventions.

The waiver of July 24, 1944, does appear to have waived the condition contained in the original agreement requiring Julian's consent to sublicensing by the corporation and to Julian's right to sublicense third parties, including the exception based upon the inadequacy of the corporation's facilities embodied in the modification of July 10, 1944. However, the modification of October 27, 1944, imposed a further condition upon the right of the corporation to sublicense based upon the financial reliability and adequacy of production facilities of the sublicensor.

The waiver of July 26, 1944, was a belated consent to the sublicense granted the Corona Corp. on May 26, 1944. It also defined the word "use" employed in the original agreement to mean "make, use, and sell."

Lastly, by the final modification of October 27, 1944, Julian retained the right to "withdraw all rights from the corporation" relating to "new developments," for a period of 6 months from the date the item was proposed to the corporation or details disclosed relating to "reduction to practice."

Considered separately or as a whole the five documents in question did not constitute a sale or exchange of all substantial rights to the patents and inventions involved.

The above conclusion, based on an analysis of the documents themselves, is sufficient to dispose of this case. Additionally, however, it is to be noted that the so-called agreement, waivers, and modifications were signed, or approved and accepted, by Mildred for the corporation. While the signature of a contract with the name of an individual, adding the word "for" a named corporation, may be binding on the corporation (7 Fletcher, Cyclopedia Corporations, sec. 3032; *Sun Printing & Publishing Assn.* v. *Moore*, 183 U.S. 642), as a general rule, unless expressly conferred, a secretary or a treasurer of a corporation has no authority to make any contracts on its behalf and in its name (2 Fletcher, Cyclopedia Corporations, secs. 637, 654; *Klein* v. *Louis Barnett Sons*, 158 N.Y.S. 627; *Greene* v. *Iroquois Hotel & Apt. Co.*, 84 N.Y.S. 591). In the absence of any showing that Mildred was authorized to contract for the corporation, it is extremely doubtful that the documents in question were of any binding effect for any purpose for want of mutuality.

Aside from the inadequacies of the documents themselves, the "total factual complex" surrounding the transactions indicate a lack of any real intent on the part of either or both of the petitioners to surrender to the corporation all of Julian's interest in the patents or inventions. The documents show a studied effort to retain control. Julian's expressed view that "rights to the patents did not transfer" upon execution of the various documents but only when the corporation first began to use the invention indicates he did not consider or intend the

documents as a sale. While his statement, as a conclusion of law, is open to question, it does indicate his intention to retain control and his disregard of the agreements. His view was also apparently shared by Mildred as evidenced by her testimony that patent No. 2,221,867 was transferred to the corporation on October 27, 1944; that patent No. 2,298,003, patent No. 2,305,096, and patent No. 2,310,149 were transferred on March 27, 1945; and that application No. 138838, on which patent No. 2,592,165 later issued was transferred on May 1, 1950; that application No. 676617 filed June 14, 1946, was transferred January 14, 1947; and that application No. 707737 filed November 4, 1946, was transferred on June 4, 1947.

Further evidence of petitioners' disregard of the agreements is indicated by the execution of the sublicensing agreement between the corporation and Corona Corp. on May 26, 1944, without prior written consent of Julian and petitioners' disregard of the minimum royalty provisions. It is evident from the above that Julian treated the corporation as his alter ego and that he did not deal with the corporation at arm's length.

It might further be noted that even if it should be held that the documents in question constituted a sale of patent rights it would have no application to the patent and applications issued or applied for subsequent to 1944. Agreements to assign *all* future inventions, unlimited as to subject matter and time, have in general been held to be invalid. Rigsdale Ellis, Patent Assignments, sec. 133 (3d ed. 1955); *Guth* v. *Minnesota Mining & Mfg. Co.*, 72 F. 2d 385 (C.A. 7); *Aspinwall Mfg. Co.* v. *Gill*, 32 F. 697 (D.N.J.). Cf. Ellis, Patent Licenses (a companion volume to Rigsdale Ellis, Patent Assignments), sec. 3 (3d ed. 1958). Also, unless clearly expressed in the agreement, or based upon employer-employee relationship, an assignment of specified issued patents does not transfer later improvements or modifications of the inventions set out in such issued patents. Rigsdale Ellis, Patent Assignments, secs. 126, 127; *General Time Corp.* v. *Padua Alarm Systems*, 199 F. 2d 351 (C.A. 2); *Monsanto Chemical Works* v. *Jaeger*, 31 F. 2d 188 (W.D. Pa.).

In the original agreement dated July 28, 1943, involved herein, Julian agreed to license the corporation "to use all patents * * * currently owned * * * or * * * hereafter acquired * * * or invented * * * by him." This provision was not changed by any of the later modifications or waivers, except to define the word "use." The agreement is unlimited as to subject matter and time and, on the authorities cited above, is therefore invalid insofar as subsequent patents or inventions are concerned. It is to be presumed that the corporation made use of the latest inventions and improvements made available to it and petitioners have not shown that the amounts paid to Julian by the corporation in 1955 were not derived from the use of the later inventions, or

to what extent, if any, they resulted from the use made of patents owned by Julian as of July 28, 1943. In the absence of such a showing and in view of the invalidity of the agreement to effect a sale of the later inventions, the amounts involved must necessarily be considered as ordinary income. Neither *Carl G. Dreymann*, 11 T.C. 153, nor the authorities cited and quoted therein relating to the question of the "validity" of the agreement require a different conclusion. The *Dreymann* case involved an oral agreement by petitioner therein to give his daughter a one-half interest in a moistureproofing process, not yet perfected or patented, in return for her assisting him in perfecting it. It was held the daughter acquired an undivided one-half equitable interest in the property from the moment the process was reduced to practice and the royalty income realized from such interest was not taxable to the petitioner. In *Littlefield* v. *Perry*, 88 U.S. 205, cited in the *Dreymann* case, the Court stated: "The assignment in this case, *by its express terms*, covers all improvements in the original patent or invention described in the application of 1852." (Emphasis supplied.) *Conway* v. *White*, 9 F. 2d 863, quoted in the *Dreymann* case, involved an agreement contained in an employment contract to transfer to the employer "all inventions and discoveries made by" the employee "during the term of his employment, which in any way may affect any articles manufactured by" the employer "and used or capable of being used in the business of" the employer. As the Court itself stated: "It [the contract] was not an agreement to assign in gross the defendant's future labor as an inventor, but only the inventions and discoveries made during the term of his employment, and which in any way might affect the articles manufactured by the company, and which were used or capable of being used in the business."

We hold that the amounts received by Julian from the corporation in 1955 constituted ordinary income and not capital gain. In view of our holding on the first issue it is not necessary to discuss the second stated issue.

*Decision will be entered for the respondent.*